**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-103 (CJN)** |
| **v.** | : | |
| | : | |
| **ROBERT PACKER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Robert Packer ("Packer") to 75 days of incarceration followed by 36 months of probation, 60 hours of community service, and $500 restitution.

## I.     Introduction

The defendant, Robert Packer, drove from Newport News, Virginia to Washington, D.C. to participate in the Stop the Steal rally, and ultimately in the January 6, 2021, attack on the United States Capitol. This was a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Packer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 75 days of incarceration is appropriate in this case because Packer:

(1) observed police and barricades outside the Capitol, went up the Northwest stairs on the West Front after the police line was breached, and saw rioters climbing through broken windows at the Senate Wing Door where he entered only six (6) minutes after the initial breach;

(2) heard but ignored officers inside telling the crowd to stop; was in the Crypt while officers tried to push rioters back; and was behind the rioters that pushed against the police line at the Memorial Doors, which allowed the mob to move deeper into the Capitol;

(3) watched as police grappled with a rioter who had sprayed fire extinguisher retardant inside the building;

(4) was part of the crowd in the Speaker's hallway where the wooden "Speaker Nancy Pelosi" sign was splintered and broken by a rioter, and went into an office in the hallway of the Speaker's Office suite, a non-public area;

(5) was in the packed Statuary Hall connector as rioters breached the police line into the House side of the Capitol. He went to the Speaker's Lobby doors where he watched a rioter smash and break out the interior door window;

(6) was feet away at the Speaker's Lobby doors when he heard a gunshot and saw Ashli Babbitt fall as she was trying to climb into House hallway through a broken window. He left the Capitol building only when armed officers arrived to clear the rioters after the shooting;

(7) has not expressed sincere remorse of this conduct on January 6; and

(8) has been a habitual criminal offender for twenty-five years, with twenty-one convictions, mostly for traffic offenses, but also for larceny, drug possession, and forgery.

2

The Court must also consider that Packer's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Packer's route through the Capitol while members of Congress were evacuating was extensive. His presence at six (6) different areas where rioters were confronting police, and his entry into an office, the Speaker's hallway and the Speaker's Lobby – all sensitive areas - makes a significant jail sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 38 (Statement of Offense), at 1-5. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Packer's conduct and behavior on January 6.

### *Robert Packer's Role in the January 6, 2021 Attack on the Capitol*

Packer drove from his home in Newport News, Virginia to Washington, D.C. to attend the Stop the Steal Rally promoted by former President Trump.  Packer knew when he came to Washington, D.C. that people were there to protest the 2020 presidential election and that after the speeches there would be a march to the U.S. Capitol.  On the day of the Stop the Steal Rally,

January 6, 2021, Packer wore a distinctive sweatshirt with "Camp Auschwitz" and "Work Means Freedom"[2] on the front and the word "Staff" on the back:

Exhibit 1



Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  Packer also walked to the Capitol after the rally, and upon coming up to the grounds of the Capitol, saw barricades and police outside. He was at the West Front of the Capitol and climbed the Northwest Stairs to the Upper West Terrace after rioters fought with police officers and broke through the line. Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd

---

[2] The phrase recalls the sign over the entrance to the Auschwitz death camp operated by Nazi Germany in occupied Poland during World War Two, bearing the words: "Arbeit Macht Frei," meaning "work will set you free." *See* http://70.auschwitz.org/index.php?option=com_content&view=article&id=212&Itemid=179&lang=en.

penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.

At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.  The red circle on the image below indicates the stairs where Packer went up sometime after 2:10 p.m., after rioters fought police and gained access to the Upper West

Terrace.



Although rioters were climbing through broken windows by the Senate Wing door, Packer entered the building anyway, only six (6) minutes after the initial breach of those doors. Despite observing violence once inside, Packer continued throughout the Capitol walking deeper into the building. He was in the crowd when rioters confronted officers in the Crypt.  He was with a crowd that pushed past police at the Memorial Doors to get deeper inside, to the Rotunda, Statuary Hall, and the House. Packer was in the crowd as the rioters in the Statuary Hall connector pushed past the police line into the House side of the Capitol. He was present when a rioter, trying to climb through a broken window into the hallway by the House Chamber, was shot. Only then did he leave the building as armed police were channeling people outside after the shooting, until herded out by armed officers in riot gear.

*Robert Packer's Route into and Through the Capitol*

Packer (identified in the following images by a red circle) walked up the steps of the Upper West Terrace of the Capitol building, as captured by CCTV, after officers holding the rioters back were overtaken and the crowds rushed up the steps, at approximately 2:11 p.m.:

Exhibit 2



Videos on Packer's phone[3] indicate that he came up to the Capitol through the West Front lawn.[4] One video depicts the scene at the bottom of the Northwest stairs.  Exhibit 29.  The next video shows rioters climbing the stairs and the scaffolding to get to the Upper West Terrace. Exhibit 30.  As he approached the Capitol, Packer took a video showing the crowd in which tear gas/smoke is clearly visible.  Exhibit 31. Packer then took a video from the Upper West Terrace

---

[3] The cell phone was seized and searched pursuant to a search warrant executed simultaneously with Packer's arrest.  These videos have been provided to defense counsel.

[4] One video from Packer's phone depicts the East side, but it loops the same scene three times. It appears to have been edited to emphasize a police officer appearing to wave rioters onto the property past barricades.

that shows hundreds of rioters and some police officers, who were clearly outnumbered by the mob. Exhibit 32.

Packer then entered the Capitol Building through the Senate Wing Door at 2:19 p.m., roughly six (6) minutes after the window immediately adjacent to the door was smashed out by other rioters who used a stolen police riot shield and rioters poured inside, about 2:13 p.m. The U.S. Capitol was first breached in this location by a rioter who jumped through the window over the broken glass as captured on footage from the U.S. Capitol Police cameras (CCTV):

Exhibit 3



Exhibit 4



Packer turned right, walking past the shattered glass on the floor from the smashed-in windows, and traveled down the hallway into the Crypt, as shown below in another rioter's video (Exh. 5 and Exh. 34) and in open-source image (Exh. 6):

Exhibit 5



Exhibit 6



Packer himself took a video with his phone as he was walking toward the Crypt. Exhibit 33.

As he entered and went through the Crypt, at approximately 2:25 p.m., the police were being confronted by the crowd, as shown below in an open-source media image:

Exhibit 7



CCTV at approximately 2:25 to 2:26 p.m. shows the rioters rushing police inside the Crypt.

Exhibit 35. After Packer left the Crypt, he joined a mob of rioters located near the Memorial

Door by 2:26 p.m.. CCTV also captured Packer as part of the mob that was shouting and pushing police to make their way up to the Rotunda and Statuary Hall:

Exhibit 8



Exhibit 9 and 10





Packer was behind rioters who were pushing against the police in order to advance further into the building[5]:

Exhibit 11



Packer then walked through Statuary Hall, shown below in a screen shot from a YouTube video:

---

[5] One of the officers was sprayed with fire retardant. It can be seen on his uniform lapel in Exhibit 23 where he stood with two other officers trying to keep rioters out of the Speaker's Lobby after leaving the Memorial Door area.

Exhibit 12



He made it to the Speaker's Office suite area, along with the rioter holding up the splintered and broken sign of Speaker Pelosi, as show in open-source media images, Exhibits 13 -15:

Exhibit 13



Exhibit 14



Exhibit 15



Packer walked down the hallway of the Speaker's Office suite and was caught on CCTV as he entered and left an office, believed to be H233, as depicted below:

Exhibit 16



Exhibit 17



Packer was caught in another defendant's video as one of the first to arrive in the Statuary Hall

Connector where the rioters ultimately broke through to the House side of the Capitol:

Exhibit 18



Exhibits 19 and 20





Packer is also seen in CCTV in the Statuary Hall Connector crowd amid Stop the Steal signs, and chants of "USA! USA!" when the mob pushed past the police line at approximately 2:36 p.m. to enter the House and Speaker's Lobby area:

Exhibit 21



Exhibit 22



Packer and other rioters approached the Speaker's Lobby Door to the occupied House Chamber, protected by three officers. A video on Packer's phone portrays him turning the corner and approaching the doors.  Exhibit 36.  One of the officers was covered in pepper-spray residue (the same officer confronted at the Memorial Door, as discussed earlier in this memo).  Rioters smashed the windows on the Speaker's Lobby Door, over the top and around these officers, while the mob shouted, "open the door," "stop the steal," "break it down" and general obscenities at the officers.  Packer watched as rioters broke out the glass of the interior doors, shown in the below image from RMG News:

Exhibit 23



From TheResistance.Video:



And from Washington Post online:

Exhibit 24



windows with flag poles and helmets.

Packer then heard a gunshot and saw a rioter, Ashli Babbit, fall as she tried to climb through the broken window outside the House Chambers as members were watching. Packer was noted right in front of John Sullivan (JaydenX) as he filmed the Speaker's Lobby door and the shooting of Babbit: (the red arrow points to Packer's head):

Exhibit 25



Packer was captured on a YouTube video standing against the wall, immediately after the shooting:

Exhibit 26



Packer admitted to the FBI in an interview after his plea that he was ten to twelve feet from the woman (Babbit) when she was shot. He told the agents he heard the shot and saw her fall back from the window she was trying to climb through.

Packer was captured on CCTV as he left at approximately 2:55 p.m. from the Southeast doors as police were herding out the rioters after the shooting. He then stayed outside using his cell phone, as captured on another defendant's video footage.

Exhibit 27



Exhibit 28



In total, Packer spent over minutes 35 minutes inside of the Capitol. Packer has admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to

do so, and he engaged in disorderly and disruptive conduct in the Capitol Building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress.

*Robert Packer's Interview*

Packer agreed to an interview with the FBI after his plea. During the interview, Packer admitted to seeing barriers and police as he walked up to the Capitol building, and to seeing rioters and police on the stairs. He said he took a couple of videos and admitted seeing rioters going in through broken windows. The FBI seized and searched his cell phone pursuant to a search warrant. Videos from the events of January 6, 2021, were contained in the phone.

After going inside, he said the crowd was so large, he was crushed against a column. He told the agent police were telling people to stop but the police could not stop the flow of the crowd.  Once inside, he saw a man with the Speaker's sign and admitted to going into a room in the same area, where the man was trashing papers.  Packer told the agent he saw a rioter spray a fire extinguisher after which police took him "down."  Packer said he saw a gun clip laying on the ground which an officer picked up.

Packer saw a man beating out the window where the rioter was shot and saw her fall after he heard a gunshot.  He also told the FBI agents that police in riot gear and guns came up the stairs, right after the shooting after the original officers at the door had left.

Although Packer agreed to the interview, he was not completely forthcoming.  He falsely claimed to have been inside the Capitol for only a short time. When asked why he wore the Auschwitz sweatshirt, he fatuously replied "because I was cold." Without expressing any remorse for being part of the rioting that day, Packer continually said it was "hard to tell" which side people were on.

*The Charges and Plea Agreement*

25

On January 12, 2021, Robert Packer was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2). On January 13, 2021, he was arrested at his home in Newport News, VA. On February 10, 2021, Packer was charged by a two-count Information with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2).  On January 26, 2022, he pleaded guilty to subsection (e)(2)(G) contained within Count Two of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2), Disorderly Conduct in the Capitol Building. By plea agreement, Packer agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Packer now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Packer faces up to six months of imprisonment and a fine of up to $5,000. Packer must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)
]

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Robert Packer saw the barricades and the police outside the building. He also would have seen tear gas in the air as police were trying to prevent rioters reaching the building. He would have seen the officers trying to hold back the rioters who were on the Northwest stairs, pushing to get to the Upper West Terrace to enter the Capitol. He himself took advantage of the rioters overtaking that police line and walking up those stairs to get to the Upper West Terrace. No rioter was a mere tourist that day.

Additionally, while looking at Packer's individual conduct, this Court should look to a spectrum of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Packer personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Packer's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Packer from most other misdemeanor defendants.

Packer's actions that day showed a determination to protest the 2020 election by unlawful means. He ignored the signs that the area around the Capitol was restricted. He saw police and barricades outside, yet he moved forward. He went to the Upper West Terrace after rioters overran police to gain access. He then himself accessed the building through an entryway six (6) minutes after it was breached, and where it was obvious that violence had occurred. The Senate Wing door and windows were broken out and glass was littered inside and out. Once inside he was present during several confrontations with police who were obviously trying to keep people from getting farther into the building. These occurred in the Crypt; by the Memorial Door, where Packer himself was amongst rioters that pushed to get through; in the Statuary Hall Connector; and at the Speaker's Lobby doors. He saw police take a rioter into custody after fire retardant was sprayed into the air. He watched rioters break windows and he saw the rioter who was shot fall. The scenes he observed every step of the way showed his presence in the Capitol was a violation of law, yet he persisted through until police armed with weapons and in riot gear herded the mob outside.

Packer's statement to the FBI shows a total lack of remorse. He claimed he wanted to leave the building but that it was so crowded that even when police said to stop, there was nowhere to go "but forward." Packer's statements were evasive and he minimized his actions. He was more interested in relaying how he received hate mail and how he was "hounded" by the media for interviews. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Packer's History and Characteristics

As set forth in the PSR, Packer has a lengthy criminal history, with approximately 21 convictions, mostly but not exclusively for motor vehicle violations, especially for drunk driving. His criminal history, which takes up 17 pages of the PSR, includes misdemeanor larceny, two reckless driving convictions, several Habitual Offender convictions, three DUIs, several refusals to take a breath or blood test, and a conviction for possession of marijuana.  ECF 42, PSR at ¶¶ 25-36, 38-44. It appears he was revoked in at least four (4) cases.  *Id.* at ¶¶ 28, 32-34, Packer also has a felony conviction for forging public records. *Id*. at ¶ 37.  He was incarcerated for several of these convictions. *Id*. His non-convictions, arrests and unknown dispositions are lengthy as well. *Id*. at ¶¶ 46-72. He is self-employed as a pipe fitter and a non-licensed plumber. *Id*. at ¶¶ 93, 96. The PSR also indicates that Packer failed to call in as directed by the United States Probation Office four (4) times between February 27, 2021 and January 1, 2022. *Id. at* ¶ 9.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Packer's presence, actions on January 6, and statement to the FBI, clearly demonstrate the need for specific deterrence for this defendant. Packer did not retreat in the face of violence but rather penetrated farther and farther into the United States Capitol building keeping in step with the violent mob.  As of the date of this filing, Packer has not expressed remorse. When interviewed by the FBI at the time of his arrest, he repeatedly asserted that could not tell who was on what "side," thus exhibiting his true reason for being at the Capitol. He was aware that there was a march to be held to the Capitol to protest the 2020 presidential election during which our nation was very divided. Packer's failure to acknowledge the clear indicators that the Capitol was off limits on January 6, 2021, his observations of violence in at least six areas where police were confronted by rioters, his entering the work areas of Congress while the certification was going on, and his lack of remorse underscore the need for specific deterrence in this case.

## E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[7] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[8] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's

---

[7] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have made meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Packer has pleaded guilty to Count Two of the Information, charging him with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with police. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted

disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed on the defendants below.

Recently, your Honor reently sentenced **Clifford Meteer** in 21-cr-630 (CJN) to 60 days incarceration, followed by 36 months of probation. The government had requested 75 days incarceration. Meteer, like Packer, followed the rioters that overcame the police on the Northwest stairs; was also inside the Capitol about 31 minutes; and made his way, as Packer did, to the Crypt and Statuary Hall. He too had a significant criminal history. Meteer, however, did not find his way to six different points of violence within the building, as did Packer.

**David Mish**, 21-cr-112 (CJN), pled to the same misdemeanor as Packer. The government recommended, and this Court imposed, 30 days incarceration. Mish has a lengthy criminal history, as does Packer. And, like Packer, Mish was inside the building about 30 minutes, and he too heard

34

the shot that killed Ashli Babbitt.  Like Packer, Mish witnessed violence on police but was not violent himself.   Packer's conduct, however, is more egregious than that of Mish and a sentence of 75 days incarceration would, by comparison, be appropriate.  Mish carried a flag inside the Capitol, and heard, but did not see, Ashli Babbit's shooting. He witnessed police officers being sprayed with fire retardant.  When compared to Packer's presence at six different points of violence, including being present when Babbit was shot and seeing her fall, Mish's sentence of 30 days, if imposed upon Packer, would be an unwarranted sentence disparity.

**Andrew Ericson**, 21-cr-506 (TNM), was inside the Capitol for about 15 minutes but, like Packer, he went into a sensitive space.  Ericson entered the House Speaker's conference room on the second floor, posted a photo of himself with his feet on the conference table, and took a beer from the refrigerator. He saw officers overrun by a crowd of rioters and posted on Snapchat while cheering on criminal activity.  Judge McFadden imposed 24 months of probation with 20 days incarceration, to be served on consecutive weekends.

**Brian Stenz**, 21-cr-456 (BAH), also entered an office, as did Packer. He also had a significant criminal history, but unlike Packer, took photographs while inside.  His entry into Senator Merkley's office combined with entering the building despite seeing people breaking windows outside, netted him a sentence imposed by Chief Judge Howell of 14 days of incarceration as a condition of 3 years of probation, along with a $2,500.00 fine. Packer also saw violence against police on the Northwest stairs before entering the building.

**Joshua Wagner**, 21-cr-310 (ABJ), also pled guilty to violating 40 U.S.C. §5104(e)(2)(G). Like Packer, he too climbed into the Capitol through a broken window. He ignored police orders while in the Crypt, whereas Packer was behind the rioters who pushed past the police line outside the Crypt by the Memorial Doors.  He chanted "Our House" and called police "traitors."  Judge Jackson imposed a sentence of 30 days of incarceration.

The government has requested, and Courts have imposed, incarceration or home detention in many January 6 cases, as was done in Mish, Meteer, and Stenz, discussed above. *See also United States v. Simon*, 21-cr-67 (ABJ) (35 days incarceration); *United States v. Tutrow*, 21-cr-310 (ABJ) (two months home detention); *United States v. Smocks*, 21-cr-198 (TSC) (14 days incarceration); *United States v. Register*, 21-cr-349 (TJK) (45 days incarceration).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—75 days of incarceration followed by 36 months of probation—is a lawful one, as this Court recognized when it imposed such a "split sentence" on April 21, 2022 in *United States v. Clifford Meteer*, 21-cr-630 (CNJ).

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022)

(concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence).  In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

**VI.     A sentence imposed for a petty offense may include both incarceration and probation.**

*A.  Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today.  *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[9] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically

---

[9] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10).  *See* Part II *infra*.

provided." 18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D."  18 U.S.C. § 3551(b).[10]  As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation

---

[10] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### B.  Analysis

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section

3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b).  *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers."  *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States*

*v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  Packer pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six

months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**VII.    A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

### A.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation, a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[11]

### B.  *Analysis*

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3653(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period"

---

[11] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[12]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient

---

[12] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

sentence. Balancing these factors, the government recommends that this Court sentence Robert Packer to 75 days of incarceration, 36 months of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     */s/ Mona Lee M. Furst*
        MONA LEE M. FURST
        KS Bar No. 13162
        Assistant United States Attorney
        Detailee – Capitol Siege Division
        U.S. Attorney's Office
        601 D. Street, N.W.
        Washington, D.C.  20579
        Office: 316-269-6537