UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                               :

     v.                                    :   Crim. No. 21-103 (TJK)

ROBERT KEITH PACKER              :

## MEMORANDUM IN AID OF SENTENCING

COMES NOW Defendant, Robert Keith Packer, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, LLP, and submits that a probationary sentence, along with restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a) under the unique circumstances of this case.

### *Procedural Background*

Mr. Packer is before this Court after having pled guilty to one count of Parading, Demonstrating, or Picketing in the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).

He was initially arrested on January 13, 2021, and was released on his personal recognizance.  He made his initial appearance in the District on January 19, 2021, and was again released on his personal recognizance.

On February 10, 2021, the government filed a two-count indictment charging Mr. Packer with Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1) and Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On January 26, 2022, Mr. Packer pled guilty to the second count in the information, acknowledging that he could be sentenced to up to six months in prison, fined up to $5,000, and put on a term of probation not to exceed five years.

He has remained in compliance with his conditions of release since that time – a period of nearly 9 months.

Sentencing has been continued on two occasions because of undersigned counsel's need to adequately prepare this sentencing memorandum.

Mr. Packer is scheduled to be sentenced on Thursday, September 15, 2022.

The government has requested a sentence of 75 days in prison.  The probation office has submitted its own recommendation.

### General Background

Defendant was charged in connection with the "very unfortunate" circumstances that occurred at the United States Capitol on January 6, 2021.

On that date, Mr. Packer came to Washington, D.C. to hear a speech by the former president.  After the speech, he, along with thousands of other individuals, and at the direction of the former president, walked to the United States Capitol.

The marchers had been instructed by various speakers to "fight" to keep the former president in power, and many in the crowd were energized, angry, and spoiling for a fight.  Mr. Packer was not one of those who was spoiling for a fight.

### The Scene Inside and Outside the Capitol that Afternoon

As this Court surely has discerned, having presided over a number of January 6 cases by now, there were varying levels of participation and action by

2

different people, and groups of people, at the Capitol on that day, both on the grounds outside the building, and inside the Capitol itself.

Some, as has been shown in numerous video recordings, were prepared for battle, wearing military-style outfits, carrying different types of weapons (guns, sticks, batons, flagpoles that were used as weapons, pepper or bear spray, etc.) and implements of battle (zip ties, rope, etc…).

Many of the individuals had also posted messages in various social media platforms before January 6 indicating that it was time for a civil war, and that they would not accept the official results of the election that were certified by the 50 States.

It is fair to say that the crowd, generally, was very angry about the outcome of the election, and strongly disagreed with certification of the votes by various State officials.  Some in the crowd had resolved not to allow a peaceful transfer of power to a new administration.

However, it is equally clear that while some in the crowd were prepared for a physical battle, others went there to shout, scream, and protest the official results of the election.

Some entered the Capitol building, while others stayed on the grounds outside the building.  A fairly small number of people used violence to break windows and push open doors so that they, and others behind them, could gain entry to the building.  And while some people witnessed this violence as it

occurred, others arrived after windows had been smashed, and doors had been opened (and barricades removed or pushed aside).

A number of protestors engaged in physical confrontations with police officers, both inside and outside the Capitol. Some of the interactions were quite violent, and caused injuries to a number of officers.

Other protestors destroyed property and otherwise vandalized some areas of some offices inside the building.

Many people shouted various chants, and some shouted at the police officers who were attempting, often in vain, to keep the crowd from entering further into the Capitol building once the crowd had breached the perimeter.

Some individuals threw flagpoles, stolen police shields, chairs, and other objects towards police officers. Some gathered in a lower tunnel (artificially created for the inauguration that was to take place on January 20, 2021) and attempted to push their way into the building that way.

Others sprayed some officers with various substances, and were otherwise very hostile and demonstrative toward the police, aggressively screaming in their faces.

### *Mr. Packer's "Actions" that Afternoon*

Mr. Packer's actions at the Capitol on January 6, 2021, on the other hand, were about as passive as a member of the crowd could have been that day.

While he admits entering the Capitol and knowing that he was not allowed to be there, based on the images provided in discovery, some of which appear in

the government's sentencing memorandum, Mr. Packer literally walked around the Capitol looking like he was in another world.  And while undersigned counsel does not wish to insult Mr. Packer or the character Forrest Gump, Mr. Packer's demeanor and presence at the Capitol that afternoon, during the approximately 36 minutes he was in the building (from 2:19 p.m. to 2:55 p.m.), appeared to be similar to the character played by Tom Hanks in the movie Forrest Gump – a man who went through life almost as if he was outside of his body and mind, looking in.

As the photographs of Mr. Packer show, he walked around various parts of the Capitol with a flat affect, his mouth mostly closed, and seemingly overcome by the venue's grand architecture and history, or perhaps in shock at what he was witnessing.

He never joining in any negative activity that others engaged in (other than being present in the building).

He never screamed at the police, or taunted them.

He never held a banner or flag or sign.

He never pushed up against a police line, or even joined others in doing so.

He never threw anything at anyone, or even raised his arms or hands.

He did not look angry, upset, or enraged, as many other individuals there appeared to be.

He simply appeared to "be there," walking around and following others into various parts of the building.

5

As the government notes, at one point he walked into an office and seemed to notice another person vandalizing the office or engaging in other mischief.  Mr. Packer turned around and left that office, going back into the hallway where others were already gathered.  He did not join in the activity of the other person in that office.

Interestingly, in its memorandum the government lists nine factors "this Court should look to" when considering aggravating or mitigating factors that may or may not apply to Mr. Packer's behavior that day.  They are:

1)  Whether, when, how the defendant entered the Capitol building;

2)  Whether the defendant encouraged violence;

3)  Whether the defendant encouraged property destruction;

4)  The defendant's reaction to acts of violence or destruction;

5)  Whether, during or after the riot, the defendant destroyed evidence;

6)  The length of the defendant's time inside the building, and exactly where the defendant traveled;

7)  The defendant's statements in person or on social media;

8)  Whether the defendant cooperated with, or ignored commands from, police officials; and

9)  Whether the defendant demonstrated sincere remorse or contrition.[1]

---

[1] *Gov. Sent. Memo.*, at 27.

The government notes that "these factors are not exhaustive [or] dispositive," but "help to place each defendant on a spectrum as to their fair and just punishment."[2]  If that is the case, the government's memorandum proves that based on the foregoing factors, and the "actions" it attributes to Mr. Packer, he should be sentenced to a period of probation or, at most, home detention.

Before addressing these factors one by one, defendant calls this Court's attention to the words the government uses in its memorandum to describe Mr. Packer's "actions" on that day, passive though his actions may have been.

For instance, the government states that Mr. Packer was "present" during several confrontations others had with the police.

He was "amongst" rioters who were pushing to get through in Statuary Hall (though he did no pushing himself, as was merely part of a mass of people moving in one direction).

He "saw" police take a rioter into custody.

He "watched" rioters break windows.

He "saw" the rioter who was shot, fall.

"The scenes he observed" proved that his presence was a violation of the law.[3]

---

[2] *Id.*
[3] *Id*. at 28.

Defendant does not dispute, in any way, that his presence in the Capitol was a violation of the law.  But aside from his illegal presence, he committed no other crimes while in the Capitol.

The government correctly notes that if he had committed other criminal acts, he would have been charged with further crimes, such that his failure to do so does not merit any consideration.  *Id*.

While that statement is partially true, the fact is that of all of the people who were in the Capitol on that day, Mr. Packer's actions were at the very bottom rung of criminality, as an examination of the government's nine factors will demonstrate.

1)   Whether, when, and how Mr. Packer entered the Capitol.

The answer to this question is that Mr. Packer entered through a door that had been opened by other rioters about *six minutes* before Mr. Packer arrived at that particular doorway.  While Mr. Packer could have seen broken glass if he had looked for it, there is no evidence that when he came through minutes after it had been breached, he stopped to look, or attempted to look, at the door or window whose glass had been broken.  The facts that address this factor merely prove that Mr. Packer was guilty of being in the building unlawfully, which he has admitted.

2)   Whether the defendant encouraged violence.

There is no evidence whatsoever that Mr. Packer encouraged anyone to be violent, not because of any lack of evidence, but because it did not happen.  This factor weighs in Mr. Packer's favor.

3)   Whether the defendant encouraged property destruction.

As with factor number two, there is no evidence that Mr. Packer encouraged anyone to destroy any property within the Capitol (or without).  This factor weighs in Mr. Packer's favor.

4)   The defendant's reaction to acts of violence or destruction.

The defendant, as noted above, seemed to walk around the building without reacting to much of anything, at least as far as the expression on his face in various photographs reveals.  Even when he witnessed Ashley Babbitt being shot, he appeared not to change his facial expression, despite the shock it undoubtedly caused.  He certainly never laughed at, or seemed pleased by, any violence he may have witnessed.  Thus, this factor also weighs in Mr. Packer's favor.

5)   Whether, during or after the riot, the defendant destroyed evidence.

As the government concedes, Mr. Packer did not engage in any acts of destruction, either during or after the riot.  In addition, he did not destroy or get rid of his phone.  Thus, this factor weighs in Mr. Packer's favor.

6)  The length of the defendant's time inside the building, and exactly where the defendant traveled.

The government makes much of the fact that Mr. Packer was present at six different areas "where rioters were confronting police," and "[entered] into an office, the Speaker's hallway and the Speaker's Lobby – all sensitive areas…."

However, there is no evidence that Mr. Packer would have known that any of those hallways or lobbies were "sensitive areas."

9

For those who have never visited the Capitol, it is an extremely confusing place, geographically.

Undersigned counsel has been on two so-called "Capitol tours" organized by the U.S. Attorney's Office to assist defense counsel representing January 6 defendants see various parts of the Capitol building.

In addition, undersigned counsel received an extensive, private, tour by an employee of the Architect of the Capitol given to board members of a local non-profit organization several years ago.

Despite these three multi-hour tours in the past several years, counsel could never lead anyone to any specific place inside the Capitol, as its hallways and connectors and sensitive areas are not evident to anyone who does not visit there regularly, or work in the building.

Thus, to attempt to hold Mr. Packer accountable for having visited certain parts of the building that he could not know were sensitive is inappropriate and unfair.

While he was in the building for about a half-hour, he was merely walking around with others, and following people wherever they went.  Thus, his mere presence in certain areas should not be held against him, given his inability to know where he was, or whether a particular room or hallway was more "off limits" than another room or hallway.

Defendant thus argues that this factor is "neutral" with respect to sentencing.

7)  The defendant's statements in person or on social media.

As far as counsel can tell, Mr. Packer did not post any statements on any type of social media either before or after the events of January 6, nor did he make any statements to any reporters, political entities, or anyone else for the purpose of excusing or defending his actions, or the actions of others.  This is in his favor.

8)  Whether the defendant cooperated with, or ignored, police commands.

The government argues that Mr. Packer was part of a crowd that ignored police officers' various commands, but there is no evidence that he saw or heard any such commands.  He obviously realized that he was not allowed in the Capitol building, but unlike some other individuals at the Capitol that day, there is no evidence that a police officer approached him and told him he had to leave.

Thus, this factor is either neutral, or weighs in favor of Mr. Packer.

9)  Whether the defendant demonstrated sincere remorse or contrition.

The government argues that Mr. Packer's statements to the FBI (presumably in connection with the government's forced debriefing session that is apparently required of anyone wishing to accept a plea offer) demonstrate "a total lack of remorse."  It claims that he told the FBI that he wanted to leave the building but it was so crowded that he could not leave right away.  The government implies, or asserts, that this was not the case.

The truth of Mr. Packer's statement, however, is clearly demonstrated in videos taken at the Capitol that day.  Undersigned counsel represents several other January 6 defendants, and videos that counsel has reviewed in connection with

another case show one of counsel's clients waiting nearly ten minutes to exit the
Capitol once he realized (upon the police's urging) that he needed to leave.  He
literally could not get out for ten minutes, as other individuals were constantly
streaming in, such that the exit was completely blocked.  Thus, Mr. Packer's
statement that he could not leave right away when he wanted to is very plausible.

The government also writes that Mr. Packer's statements "were evasive and
he minimized his actions."  To the contrary, it is the government that exaggerates
Mr. Packer's actions, as demonstrated above.  Counsel was there during Mr.
Packer's debrief with the FBI, and at no time did any agents appear not to believe
Mr. Packer, or to think he was being untruthful.

There was, to be sure, a point in time where Mr. Packer was asked about
another person the FBI believed was at the Capitol that day, and Mr. Packer
expressed his reluctance to discuss that person.[4]  The FBI agents did not push the
topic, and said that they understood.

Finally, the government's memorandum faults Mr. Packer for being upset
about hate mail he has received, and about the fact that he has been "hounded" by
the media.  Defendant is not sure why the government does not understand why
having a camera crew literally stationed outside his home for days, constantly
begging for an interview, or receiving hateful phone calls or other messages
regarding the events of that day would trouble him.

---

[4] That person, quite tragically, has since died, leaving behind a wife and three younger children.

12

Counsel can vouch that he (counsel) has received countless inquiries from the media about Mr. Packer – inquiries that have come from around the world. The inquiries stem, no doubt, from the words on the shirt that he was wearing that day.

Moreover, several cultural or religious organizations and persons have also reached out to Mr. Packer and/or counsel because of the shirt Mr. Packer was wearing. It appeared to counsel, however, that engaging with any of the people or organizations that contacted the defendant or counsel would have created a "circus-like" atmosphere that should be avoided. It also would not have benefitted anyone except those people and their organizations, and would have resulted in the humiliation of Mr. Packer – something counsel could not allow.

Mr. Packer emphatically states through counsel, right here and right now, that he greatly regrets going into the Capitol on January 6, 2021, and that if he had the chance for a "re-do," he would not go into that building again. He also does not condone, in any way, the violence that took place in and out of the building on that day.

### Analysis of Sentencing Factors

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable. Of course in this case, the sentencing guidelines do not even apply, as the offense to which Mr. Packer pled is considered to be a "petty" offense.

Whether or not the sentencing guidelines apply, in determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1)  reflects the seriousness of the crime;

2)  promotes respect for the law;

3)  provides just punishment;

4)  deters criminal conduct;

5)  protects the public from further crimes, and

6)  provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1)  the nature and circumstances of the offense;

2)  the history and characteristics of the defendant;

3)  the kinds of sentences available;

4)  the sentencing range;

5)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

6)  the need to provide restitution to any victims of the offense.

***The Proposed Sentence Would Reflect the Seriousness of the Crime***

14

This memorandum has already addressed the "seriousness of the crime." It has argued that compared to the conduct of all of the other defendants who entered the Capitol on January 6, 2021, Mr. Packer's conduct was about as "innocuous" as any conduct could have been.

He did not assault anyone, destroy any property, push any officers, help others push any officers, throw any object, chant any chant, raise his fist or arms in anger, shout or berate any law enforcement officer, remain in an area when he was told to leave, or post any boasts or claims on social media. He also did not destroy any evidence of his participation in that day's events, or give interviews to various news outlets minimizing what happened.

He entered the Capitol a full six minutes after the doors he went through had been breached, such that he was not "there" when the breach occurred. He followed others down whatever hallways they traveled, and into whatever great rooms (the Crypt, Statuary Hall) they went, not knowing which areas were (usually) public or sensitive. Moreover, other than his trespass, he never participated in any criminal actions undertaken by others in that vast crowd.

In light of that, he submits that a sentence of probation, along with community service and a fine of $500, would be sufficient, but not greater than necessary, to achieve the goals enumerated in 18 U.S.C. § 3553(a).

The government, in its sentencing memorandum, points to the violence committed by others in the crowd, and argues that this was facilitated by the presence of many persons like Mr. Packer.

That may or may not be true.  Some of the individuals at the Capitol that day were determined to commit acts of violence regardless of who was there.  Mr. Packer cannot be blamed for that.  And the fact that he unlawfully entered the building did not irresistibly compel any other person to assault a police officer or destroy property.

Counsel recalls the protest marches in January 20, 2017, when hundreds of thousands of people marched to protest the election of the former president.[5]

During that march, some in the crowd stepped a few feet away from the larger group and broke large plate glass windows in banks and in coffee shops. One could argue that the mere presence of so many angry or passionate people in the crowd of marchers on January 20, 2017, somehow emboldened these (apparently Antifa, based on their clothing) individuals to become violent, but that would not be a fair assessment of the alleged role of the crowd in that march.  Nor is it fair to impute the actions of a few others to Mr. Packer's mere presence.

While it has become a common refrain to say that "a mob isn't a mob without the numbers," a large group of people who are not attacking any police officers or destroying property should not be automatically accused of unwittingly encouraging troubled individuals in their commission of those acts.

---

[5] Undersigned counsel represented two separate defendants in connection with that prosecution – one person who was merely marching with the crowd, and another who allegedly broke a huge plate glass window at a Bank of America branch.  Thus, counsel is intimately familiar with the facts underlying that prosecution, and is able to make an informed comparison between that event and this one.

Mr. Packer certainly never said or did anything that would have encouraged or caused anyone else to commit acts of violence, but his mere presence among the crowd is being used to paint him as an aider and abettor of terrible acts perpetrated by deranged individuals.  That is not appropriate, or just.

### The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Packer, and Deter Criminal Conduct, both by him and by Others.

These three goals would be met through the imposition of the proposed sentence under the particular circumstances of this case, for the same reasons presented above.

Notably, and perhaps counter-intuitively, respect for the law is actually *diminished* when a sentence is unfairly high.  Here, people following Mr. Packer's case could fairly wonder why someone who walked into the Capitol, followed others to various places, and walked out after witnessing a woman being shot by the police,[6] should receive more than a probationary sentence.

Again, Mr. Packer's conduct, before, during, and after the relevant events, could not have been any more innocuous than it was.

### The Need to Protect the Public from Further Crimes.

Imposing a 36-month term of probation in this case would – not that it's needed here – protect the public from any nebulous concerns about any crime Mr. Packer may be tempted to commit in the coming years.

---

[6] Defendant is not making a comment, one way or the other, about the actions of the police in firing a single shot at the person who was attempting to climb through a broken window, and enter a highly restricted area.

Mr. Packer is nearly 58 years old.  The bulk of his past convictions – all of which are misdemeanors – stem from his alcoholism.  While he was convicted for misdemeanor larceny 35 years ago as a 23-year old, between 1994 and 2006, his convictions all stemmed from his uncontrolled drinking.  At the time of those offenses, he was between 29 and 38 years old.

Mr. Packer lost his right to drive a vehicle in Virginia many years ago, because he was considered a "habitual offender."  Because he still needed to work, however, he began a period of arrests and convictions for driving while on a suspended or revoked license, starting in 2009, and lasting until 2019.  It is clear from the information provided in the presentence report (at paragraphs 40 to 44) that although he was stopped, charged, and convicted of a number of violations of driving on a revoked license charges, he never was found to have been drinking when he was stopped for those offenses, or he would have been charged with a DUI.  Moreover, the sentences imposed by the judges who presided over those cases obviously reflected their understanding that he was "merely" driving in order to get to and from work, as he was primarily fined, rather than incarcerated.

The sad truth is that for many years, Mr. Packer was a (then) hopeless alcoholic who could not overcome his habit and addiction.  Fortunately, he never injured anyone as a result of his drunken driving.

Were it not for Mr. Packer's terrible addition, his prior record would look nothing like it does today.  And while many people state that alcoholism is a

disease, defendant recognizes that driving while drinking turns that disease into a crime.

Counsel can attest that on each occasion that he has met with Mr. Packer in person – meetings that occurred both in the morning and in the evening, depending on the visit – counsel never detected even the slightest smell of alcohol on Mr. Packer's breath, or observed any behavior (weaving, stumbling, slurred speech) or items (bottles, beer cans, etc…) that would indicate that Mr. Packer was drinking at all.

Mr. Packer stated to the presentence writer that he does have a drink several times a week, but evidence of alcohol or drinking was never observed during any of counsel's visits with him.[7]

As to the need to protect the public from any other crimes involving, perhaps, political activity and violence, defendant notes that he has learned a very hard lesson as a result of his "foray" to Washington, D.C. on January 6, 2021. The lessons learned include, but are not limited to, the fact that violence solves nothing (although he was never violent that day), protesting must be done where it also does not constitute trespassing or a violation of a law, Capitol and other government grounds should be respected, any political change must come through democratic means, such as voting, canvassing, or otherwise participating in the

---

[7] Counsel had to travel to Mr. Packer's house to visit him, as Mr. Packer is not allowed to drive.

"political process," and becoming involved in such a public event can lead to personal humiliation and embarrassment.

And despite the government's dismissive comments about the harassment Mr. Packer has received as a result of his presence at the Capitol that day, this harassment was quite significant, mostly because of the nature of the offensive shirt he was wearing.  He was also hounded by the press for many days, and images of his face and shirt were broadcast over various news outlets repeatedly over the days and weeks following January 6, 2021.

His own son will not talk to him to this day because of their strong political disagreements, and he lost his employment as a pipe fitter at a good company because of his presence at the Capitol on January 6.

Thus, Mr. Packer has already suffered serious consequences, both professionally and personally, as a result of his involvement in the events of January 6.

Further punishment is not required.

***The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment***.

Defendant submits that, thankfully, he is not in need of any educational or vocational training services, or specific medical care.

He is still employed, just not for a particular company.

His greatest concern, as expressed to counsel on many occasions, is his inability, possibly because of bureaucratic hurdles, to obtain a valid driver's

license that would allow him to resume driving to and from work or grocery stores or other places he wishes to visit.

But that is nothing this Court can assist him with, and he submits that this is not a factor that the Court need to concern itself with on his behalf.

### *The Need to Avoid Unwarranted Disparities*

This factor is often the most difficult one to evaluate, given the differences between defendants in cases such as these.  However, a review of other sentences imposed in January 6 cases **by this Court** are instructive, and point to a sentence of probation. All of the cases discussed below involved pleas to the same charge to which Mr. Packer pled.

*United States v. Michael Curzio and Bradley Rukstales, 21-CR-41(CJN)*

In these related cases, this Court imposed a 30-day sentence of incarceration in Mr. Rukstales's case, and a sentence of time-served (6 months) in Mr. Curzio's case.

The six-month sentence in Mr. Curzio's case is somewhat misleading, as it was, in actuality, a sentence of time served.  Mr. Curzio was held without bond until his sentencing, apparently because he had been released from prison after serving a number of years for an attempted murder charge only two years before the events at the Capitol.  Once this Court reached the sentencing phase, it placed Mr. Curzio on probation.

The case against Mr. Rukstales called for a 30-day sentence because after he and others entered into the Capitol, the crowd they were in caused police

21

officers to retreat downstairs, into the Crypt area, after they threw chairs at the police.

Mr. Rukstales came down the stairs, in the direction of the police officers, and once he was at the bottom, he picked up a chair and threw it in the direction where the police officers had retreated, although no officers were nearby at that precise time.

Then, when officers came to arrest Mr. Rukstales, he resisted arrest and struggled with the first two officers who tried to arrest him, causing a third officer to have to come over to help the first two, thereby taking up valuable "officer" availability where and when it was desperately needed.

In contrast, Mr. Packer was never arrested in the Capitol, did not throw anything at anyone, struggle with any police officers or other individuals, or tie up valuable and critical law enforcement resources.

*Troy Williams and Dalton Crase, 21-CR-82(CJN)*

Mr. Williams and Mr. Crase each received a sentence of probation (36 months), as well as $500 in restitution.  And the behavior in their cases was more serious than Mr. Packer's.

First, the men went into the Capitol twice.  They first went in after witnessing numerous acts of violent destruction of property, which one of them filmed, and they went in 50 seconds after the Parliamentarian Doors were breached, not a full six minutes after, as in Mr. Packer's case.  Thus, they saw what was happening at those doors before they entered themselves.

Second, after leaving the Capitol building after their first foray, they went around the building and re-entered at another point, eventually taking selfies and lighting a cigarette, seemingly with pride and pleasure at being inside.

Both men also joined in chants of "USA, USA!" and other chants.

Williams later noted that "most" of the rioters didn't want to hurt anybody, but were present "just to let them know that when push comes to shove, we will fight.  We will just walk into this bitch [the U.S. Capitol]."  He added that "if things don't change, we'll make a change."

By contrast, Mr. Packer never posted anything on social media about fighting, never posted selfies proudly showing himself breaching the Capitol, and didn't re-enter the building once he left.  He also never joined others in loudly chanting, thereby disrupting the peace normally present in the building.

*United States v. Adam Honeycutt, 22-CR-50*

Although he pled to the same charge that Mr. Packer pled to, this Court sentenced Mr. Honeycutt to 90 days in prison, for the following reasons (none of which mirror what Mr. Packer did or did not do on January 6):

a)  He went in through the Lower West Terrace, where some of the most violence took place;

b)  He entered a sensitive space used by members of Congress;

c)  He entered the building by climbing through a broken window;

d)  He filmed and posted videos of property destruction in the Capitol;

e)  He posted images on social media showing confrontations between the crowd and police officers, then ***mocked*** the vastly outnumbered police officers for "hiding" from the crowd.

f)  He helped the crowd pass a long wooden plank to others who were committing acts of violence and battling the police in the Lower West Terrace;

g)  He posted, then deleted, messages on social media, then gave a false account of his conduct on Facebook that minimized his role; and

h)  He had a heightened responsibility to respect the law because he was a bail bondsman.

Given all of the aforementioned conduct, defendant submits that Mr. Honeycutt is fortunate that he only received a sentence of 90 days.

*United States v. Clifford Meteer, 21-CR-630(CJN)*

Mr. Meteer was sentenced to 60 days in prison for the following reasons:

a)  He entered the Capitol after he followed a crowd that had overrun the police at the Upper West Terrace Staircase.

b)  He celebrated this action;

c)  He only left the Capitol when he was forced out by the police;

d)  He made statements on Facebook and in three television interviews that demonstrated a total lack of remorse for his actions;

e)  In a television interview given about a year after January 6, he made incendiary remarks about the event, and again expressed no remorse;

f)  He falsely downplayed the violence in the Capitol that day, declaring
    that there was no riot, and that the news coverage was overblown;

g)  He refused to admit, when questioned by the FBI, that he had gone into
    the Capitol; and

h)  He allegedly possessed 10 firearms, as well as ammunition, even though
    he was prohibited from doing so because he has a prior felony
    conviction.

Again, these actions are very different from Mr. Packer's actions.[8]  As
noted above, Mr. Packer kept to himself before, during, and after the events of
January 6.  He never posted anything on social media.  He never gave any
interviews to anyone about the events, despite repeated and intense requests to do
so.  He admitted to the FBI that he was there, and told them where he went and
what he did.

*United States v. David Mish, 21-CR-112(CJN)*

This Court imposed a 30-day sentence of incarceration in Mr. Mish's case.

Mr. Mish entered the Capitol carrying a flag (many of which were used to
assault officers during that day's events), and went to a restricted area (though it's
hard to conclude that most people who were there that day had any idea which
areas were more sensitive than others (other than some obvious places like the
Senate or House chambers).

---

[8] In its sentencing memorandum, the government references the Meteer case in its analysis of the disparity factor.  *Gov. Sent. Memo*. at 34.  It never acknowledges, however, all of the damning facts that distinguish Meteer's case from that of Mr. Packer.

25

Following the events of that day, Mr. Mish made various statements to law enforcement, downplaying the events of that day, blaming others for that violence, and offering to help the police with respect to the shooting of Ashley Babbitt, but perhaps not being completely truthful about what happened.

Perhaps the reason that Mr. Mish received a 30-day sentence is because his prior record was extensive.  In that respect, so is Mr. Packer's.  The big difference between the two men, however, is that Mr. Mish's prior convictions include Sex with a child 16 or older, as well as child abuse.  A robbery with use of force was ultimately dismissed.  He was also convicted of possession with the intent to distribute THC, as well as for bail jumping.

Mr. Packer's record, as already discussed, stemmed almost entirely from his alcoholism – a big difference, in this case.

The government's memorandum also discusses the cases of several other January 6 defendants who were sentenced by other judges, and defendant will address those cases now.

*United States v. Andrew Ericson, 21-CR-506(TNM)*

Interestingly, the government highlights a case where, once again, a defendant engaged in more troubling conduct than Mr. Packer.  Mr. Ericson actually entered the Speaker's conference room, sat in a chair there, with his feet up on a table, and posted a photo of himself doing that.  That displays a great deal of bravado and arrogance.

26

Mr. Ericson also stole (apparently) a beer from the refrigerator.  He also cheered on the criminal activity that was taking place that day – something that is beyond the pale, given how police officers were severely outnumbered.

*United States v. Brian Stenz, 21-CR-456(BAH)*

Mr. Stenz received a 14-day prison sentence from the Chief Judge.  Mr. Stenz, unlike Mr. Packer, took photos while inside the Capitol.  He also entered into the office of Senator Jeff Merkley and took pictures of that office.  He was also not completely truthful with the FBI when he was interviewed, denying that he had been in a senator's office.  He also deleted/destroyed evidence that was inh his phone.

Finally, he also has an extensive criminal history, and at the time of his entry into the Capitol, had a pending charge in Pennsylvania for falsifying records in order to obtain a weapon.

Again, there are stark differences between Mr. Stenz's conduct and that of Mr. Packer, all of which break in favor of Mr. Packer.

*United States v. Joshua Wagner, 21-CR-310(ABJ)*

Mr. Wagner received a 30-day prison sentence.  That sentence appears quite short when one considers the behavior in which Mr. Wagner engaged.  For instance, Wagner made numerous belligerent statements to police, including "this is our house!"  He also exhorted others in the crowd to hold their positions and the perimeter, and to not leave the Capitol grounds.  He wondered aloud why others had not brought assault rifles to the Capitol because "we could literally take it over

right now." He told his co-defendant, Israel Tutrow, that they should "hold" their ground, because others were going to "show up with weapons now." *Gov. Sent. Memo.*, at 2.

When Mr. left the Capitol building, he urged others who were outside not to fight amongst themselves, but to go inside the Capitol if they wanted to fight, presumably with police.

This type of conduct is so outrageous that it bears no comparison to the conduct exhibited by Mr. Packer.

*Summary of Other Cases*

A look at all of the foregoing cases demonstrates that Mr. Packer's behavior in the Capitol that day was truly among the most calm, non-confrontational, and non-violent conduct that anyone displayed on that fateful day. While his entry into the Capitol, as well as his meandering behind the crowd into several areas of the building, were wrong, he did nothing violent, said nothing violent, encouraged no violence, posted no inflammatory, proud, or other messages on social media, or otherwise engaged in any conduct beyond merely being present in the building.

That distinguishes him from so many other defendants, and points toward a probationary sentence and an award of restitution.

While he does have an extensive misdmeanor criminal record, it almost completely revolves around his alcoholism – something that he has apparently, and admirably- addressed.

28

*Conclusion*

Mr. Packer is before this Court after having pled guilty to one of the most minor charges to have been lodged against individuals who entered the U.S. Capitol on January 6, 2021.

His conduct is also among the most minor, criminally speaking, of any one who entered the building that day.

While his criminal history is lengthy, it is mostly 20 to 30 years old, and represents the product of a serious alcohol addiction that has kept him from having a driver's license for a long time.

Despite those challenges, Mr. Packer has continued working, paying taxes, and keeping a clean house (as counsel witnessed for himself on the several occasions he met with Mr. Packer in Newport News, Virginia).

His son will not speak with him because of Mr. Packer's political views, but his sister, Kimberly Rice, speaks very well of her brother.  Her letter to this Court is attached hereto as an exhibit.

Given Mr. Packer's limited behavior on January 6, his successful rehabilitation (regarding alcoholism), his steady and full-time employment history, and his remorse about his actions on that day (and determination never to become involved in something like this again), defendant submits that a probationary sentence is appropriate.

If, for some reason, the Court believes that his punishment should be greater, Mr. Packer asks that the Court sentence him to home detention for a limited period of time.

Respectfully submitted,

/s/

_____

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 10th day of September, 2022, to all counsel of record.

/s/

_____

Stephen F. Brennwald