```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3     United States of America,      ) Criminal Action
                                     ) No. 21-cr-103
4                     Plaintiff,     )
                                     ) SENTENCING HEARING
5     vs.                            ) BY VIDEO
                                     )
6     Robert Keith Packer,           ) Washington, DC
                                     ) September 15, 2022
7                     Defendant.     ) Time:  12:30 p.m.
      _____
8
                      TRANSCRIPT OF SENTENCING HEARING
9                             HELD BEFORE
                   THE HONORABLE JUDGE CARL J. NICHOLS
10                    UNITED STATES DISTRICT JUDGE
      _____
11
                        A P P E A R A N C E S
12
      For Plaintiff:       Mona Furst
13                         DOJ-USAO
                           301 North Main, Suite 1200
14                         Wichita, KS  67052
                           (316) 269-6481
15                         Email:  Mona.furst@usdoj.gov

16    For Defendant:       Stephen F. Brennwald
                           Brennwald & Robertson, LLP
17                         922 Pennsylvania Avenue, SE
                           Washington, DC  20003
18                         (301) 928-7727
                           Email:  Sfbrennwald@cs.com
19

20    _____

      Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
21                             Official Court Reporter
                               United States Courthouse, Room 6523
22                             333 Constitution Avenue, NW
                               Washington, DC  20001
23                             202-354-3267

24

25
```

1          THE COURTROOM DEPUTY:  Good afternoon.  This is

2    criminal case year 2001-103, United States of America versus

3    Robert Keith Packer, who is present by video.  Probation

4    officer is Kelli Willett.

5          Counsel, please introduce yourselves for the record,

6    beginning with the government.

7          MS. FURST:  Good afternoon, Your Honor.  Mona Furst,

8    Assistant United States Attorney, representing the government.

9          THE COURT:  Ms. Furst, good afternoon.

10          MR. BRENNWALD:  Good afternoon, Your Honor.  Stephen

11    Brennwald representing Robert Packer.

12          THE COURT:  Mr. Brennwald, good afternoon.

13          Mr. Brennwald, ordinarily, of course, we would conduct a

14    sentencing like this in person.  But during the pandemic

15    congress has authorized taking the oath, conducting of

16    sentencing hearings by video, so long as it's with the consent

17    of counsel, the defendant consents, and the judge finds the

18    sentencing cannot be further delayed without serious harm to

19    the interest of justice.

20          Does Mr. Packer consent to proceed with sentencing today

21    by video?

22          MR. BRENNWALD:  He does, Your Honor.  And if I could

23    just briefly elaborate.  He can't drive, he doesn't have a way

24    to get up here.  I would have to have somebody take him here.

25    It's absolutely better in this case.  So he definitely

 1    consents.

 2           THE COURT:  Let me confirm, Mr. Packer, you agree

 3    with that, you consent to proceeding with the sentencing

 4    hearing today by video?

 5           THE DEFENDANT:  Yes, Your Honor.

 6           THE COURT:  Thank you.  I agree it's appropriate to

 7    proceed with the sentencing by video for all the reasons

 8    stated, including the CARES Act and the currently operative

 9    standing order from Chief Judge Howell.

10        So I've read probation's presentence investigation

11    report and recommendation, the sentencing memoranda submitted

12    by the government and Mr. Packer, who supplementary is better

13    from Ms. Rice, Mr. Packer's sister, and various pretrial

14    services status reports.

15        I'm, of course, going to hear from the parties regarding

16    their positions on sentencing in a minute.  But before we

17    begin, does anyone have any written -- additional written

18    materials or submissions that I should consider?  Ms. Furst?

19           MS. FURST:  Your Honor, I don't have any written

20    materials, I just would inquire if the Court did get the

21    exhibits, the video exhibits that I sent to the Court back in

22    May when I filled?

23           THE COURT:  Yes.  Thank you.

24        Mr. Brennwald, anything additional in writing?

25           MR. BRENNWALD:  No, Your Honor.

1          THE COURT:  Thank you.  So here's how I tend to

2     proceed:  I'll first discuss and consider any objections to the

3     presentence investigation report and make my findings regarding

4     it.  I'll then, as I said, hear from parties and Mr. Packer, if

5     you would like to address the Court, about what they believe an

6     appropriate sentence in this matter is.  And then, as I

7     typically do, I'll likely take a brief recess and then come

8     back and pronounce sentence.

9          As to the PSR, it appears to me that both parties have

10    reviewed the PSR and had the opportunity to object to it, and

11    that there are no outstanding objections to it.  Is that

12    correct, Ms. Furst?  Does the government have any outstanding

13    objections to the PSR?

14          MS. FURST:  No, Your Honor.

15          THE COURT:  Mr. Brennwald, does Mr. Packer have any

16    outstanding objections to the PSR?

17          MR. BRENNWALD:  He does not, Your Honor.

18          THE COURT:  Mr. Packer, have you had a chance to

19    review the presentence investigation report and to discuss it

20    with Mr. Brennwald?

21          THE DEFENDANT:  Yes, I have.

22          THE COURT:  And have you had enough time to talk to

23    him about that report and the memoranda that have been filed in

24    this case, the parties' sentencing briefs?

25          THE DEFENDANT:  Yes, we talked about it.

1          THE COURT:  Are you completely satisfied with the

2     services of Mr. Brennwald as it relates to this matter?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Pursuant to Rule 32, I accept the factual

5     findings contained in the PSR regarding the circumstances of

6     the offense.  I adopt those facts for the purposes of imposing

7     sentence.  Of course, as the parties know, I did not make a

8     guidelines determination here because the guidelines do not

9     apply.

10          As I mentioned, I've reviewed the written materials and

11     videos, am familiar with this case, especially with the general

12     events of January 6th.  But I, of course, would like to give

13     the parties an opportunity to speak to what they believe an

14     appropriate sentence would be here.

15          So I will begin with you, Ms. Furst.  I don't think you

16     need to repeat specifically all the details in your sentencing

17     memoranda, but if you could articulate for me why you think

18     incarceration of 75 days is appropriate here, I would

19     appreciate that.

20          MS. FURST:  Thank you, Your Honor.  Your Honor, as

21     Maya Angelou once said, "When people show you who they are, you

22     should believe them."  And Mr. Packer showed the world who he

23     was on January 6.

24          THE COURT:  Ms. Furst, Miss Furst, could you pause

25     for a second?  I'm having a hard time hearing you.  I suspect

1    that might be true for the court reporter.  It's -- it sounds

2    like, a bit, like you're in an echo or underwater.  I don't

3    know if there's an adjustment that you might be able to make to

4    your microphone.

5            MS. FURST:  Microphone -- let's see.  I have -- I

6    have it all the way up.

7            THE COURT:  Why don't we try -- if everyone,

8    including me, could mute, and then let's see.  And, Ms. Furst,

9    the other thing I would say, if you could just, perhaps, just

10   go a little bit more slowly, that might solve the problem.  Why

11   don't we try that.

12           MS. FURST:  Can you hear me now?

13           THE COURT:  About the same.

14           MS. FURST:  Let me try -- I don't mean to interrupt

15   you.

16       How does this sound?

17           THE COURT:  Better.  And as I said, I will mute, and

18   if everyone could stay muted while Ms. Furst is speaking, we

19   can see if that helps to some extent as well.

20           MS. FURST:  Thank you, Your Honor.  I will also try

21   to speak up and closer.

22       As I was saying, Your Honor, Mr. Packer showed the world

23   who he was on January 6 by both his deeds and his actions and

24   his words.  He didn't post, as Mr. Brennwald said, on Twitter

25   or on Facebook, that's true.  But, he posted his beliefs on his

1    clothing that day.  He posted it on his sweatshirt where it

2    said "Camp Auschwitz.  Work will free you" on the front.  And

3    on the back it said "Staff."  And yesterday, Your Honor, I

4    learned that underneath that sweatshirt he was wearing an SS

5    T-shirt, which I'm showing you now.  I sent this to

6    Mr. Brennwald before I showed it to you.  And wearing this

7    attire, with his beliefs on his back, Your Honor, he then

8    attacked the very government that gave him the freedom to

9    express those beliefs, no matter how abhorrent or evil they may

10    be.

11        It was his actions with the violent mob on January 6

12    that was the criminal acts.  And his presence today are the

13    consequences of his voluntary acts.

14        Your Honor, we are asking for a split sentence, as we

15    call it, of 75 days of incarceration, with three years of

16    probation, community service, and restitution.

17        I am aware of your sentencings in the *Meteer* and

18    *Honeycutt* case.  I understand your position to be that you do

19    not believe you can impose a split sentence unless the

20    defendant agrees.  Obviously, Mr. Packer does not agree; he's

21    asking for probation.  But I would urge you to consider it in

22    this matter when you consider his individual characteristics

23    alongside the cases that I cited for you in my memo.

24        I also have a few other cases to bring to your attention

25    for the comparison analysis that happened after I filed this

1    memo in May.  And then, of course, I would be happy to answer

2    any questions I could about those cases.

3            THE COURT:  Yes, I am particularly interested in

4    thinking about where Mr. Packer, both because of his conduct on

5    January 6th and, frankly, his criminal history and the like,

6    where he fits in with other defendants who have been sentenced

7    for the exact same offense, whether by me or other judges.  So,

8    yes, if you could spend a little bit of time on that from the

9    government's perspective, that would be helpful.

10           MS. FURST:  I will, Your Honor.  Would you like me to

11   do that now?

12           THE COURT:  Yes, that would be -- I think that's a

13   very good place to start.

14           MS. FURST:  All right.  Your Honor, I'll turn your

15   attention to Judge Sullivan's sentencing of Kevin Blakely.

16   Now, these are in addition to what I've put in my memo, I know

17   that you've read that.  Kevin Blakely was sentenced to 120

18   days.  That's in 21-CR-356.  And that happened in July, I

19   believe.  Now, some of his actions were similar to Mr. Packer.

20   He entered the grounds after witnessing rioting taking place.

21   He walked past torn-down fences, officers in riot gear.

22           Mr. Packer was on the west front lawn by the northwest

23   steps.  And there were officers in riot gear below and above

24   those steps.  And in order to get up to the west front lawn --

25   there were signs saying "No entry," you know, the bicycle

1    barricades were there, had been knocked down.  And the snow

2    fencing that was sort of in the middle of the west lawn that

3    had been put up because of the construction of the inaugural

4    stage, that was trampled.  And, Your Honor, I know this from

5    other cases that I have, and I know Mr. Brennwald is familiar

6    with that area as well.  So Mr. Parker, in order to get to

7    where he was by the northwest steps, would have walked past all

8    of this.

9         Like Mr. -- or, similar to Mr. Packer, Mr. Blakely was

10   inside for about 30 minutes.  Now, he did grab an officer's

11   baton, which Mr. Packer did not do.  However, both of these men

12   joined with other rioters to push against police officers who

13   were attempting to keep them from going further into the

14   building or to get them out.

15        Now, in my memo, Your Honor, there are some pictures of

16   Mr. Packer walking down the hall.  He came in the Senate wing

17   door, he walked past all the glass and the broken windows, he

18   came up that door (sic) after coming up the stairs and the

19   scaffolding, after seeing the officers at the top of the stairs

20   trying to keep everyone away and fighting with the rioters.

21        So at the time he entered the Senate wing door, about

22   2:19, I believe, he would have already been on the upper west

23   terrace and would have seen all of this occurring.  So he

24   walked past all of that, he walked inside, he went down the

25   hall.  And one of our exhibits shows -- it has sound because

1    Mr. Packer took it -- and they're chanting, "Whose house?  Our

2    house" as they're walking down the hall to go to the Crypt.

3         Once he was in the Crypt, this is when, at 2:24,

4    officers were inside, it was quiet -- and this is also one of

5    our exhibits -- and then the crowd rushes in.  And Mr. Packer

6    would have been in that crowd.  And there is an image in my

7    memo showing him in that crowd that is from, I think, the

8    Resistance.Com -- Resistance video.  So, he was in there at the

9    time, at the initial time when the crowd rushed in.  And by

10    2:26 he was by the Memorial Doors, and that's where a line of

11    three to four officers were trying to keep people back.  And he

12    was in the front of that line, Your Honor.  There are images in

13    my memo that show you that.  And so --

14              THE COURT:  Ms. Furst --

15              MS. FURST:  -- it's a long way of saying he's similar

16    to Mr. Blakely.

17              THE COURT:  -- does that distinguish Mr. Packer from

18    a host of other defendants who have pled guilty to the parading

19    charge?  It seems to me that many of the people who have been

20    sentenced in this court would also have been or were aware of

21    the events around them.

22              MS. FURST:  Yes.

23              THE COURT:  So are you saying that Mr. Packer was

24    more aware or he should have been substantially more aware of

25    the inappropriateness of being in the Capitol or the events

1    that were going around him than most people who have been

2    sentenced for the parading charge?

3         MS. FURST:   I agree with that statement, Your Honor.

4    And this is part of the reason why:   As I laid out in my memo,

5    he was pretty much at the forefront of several breaches,

6    several violent actions by the rioters.   He was on the upper

7    west terrace, walking up the northwest steps immediately after

8    those steps were breached.   They were breached at 2:09 and he

9    was walking up there -- those steps.   He is in the video of

10   CCTV shortly after the line was broken, and he's up there.   And

11   so that's one place where he would have -- he was on the

12   forefront of it.

13        The second place, Your Honor, he goes into the Senate

14   wing doors within six minutes of that initial breach.   The

15   breach started at 2:01, by 2:15 the windows were broken out and

16   people were climbing in.   And then he goes down to the Crypt.

17   He's in that initial mob and enters the Crypt at 2:24, and then

18   he's trying to push past a police line at 2:26.   And I'm only

19   giving this to your attention, Your Honor, because in

20   Mr. Brennwald's memo he did say that Mr. Packer, you know,

21   didn't pressure or shout a chant.   And I would like to point

22   the Court to this particular place at the Memorial Door as

23   Mr. Packer pushing.

24        He also is portrayed chanting on image 10 on page 13 of

25   my memo.   There's CCTV, there's a still shot, and you can see

1    that he has his mouth open -- and this is by the Memorial

2    Door -- and his facial structure looks like he is shouting

3    something.  Again, CCTV has no sound.

4        But another example is in Exhibit 36, the video that I

5    sent to the Court.  He's going down the small hall to the

6    Speaker's lobby doors.  And beginning about 10 seconds in you

7    can see him in the video, and then 18 to 20 seconds you see him

8    cupping his mouth with his hands and you can hear a male voice

9    saying, "Open the door."

10       I cannot tell you, because I don't see his mouth move,

11   that it was Mr. Packer, but the circumstances indicate that it

12   likely was.  And I'm only pointing this out, Your Honor,

13   because Mr. Brennwald had indicated Mr. Packer did not chant,

14   did not say anything, did not push.

15       The other areas he was at the front of the line was by

16   the Speaker's lobby doors.  He was also in the Statuary Hall

17   connector.  He was not at the front of the line, about a third

18   of the way back, but he was one of the first people that was in

19   that area as well.

20       Then he goes with the mob and breaks through and he ends

21   up one of the people who sees the rioter get shot.  Now, he

22   says he didn't see her get shot, he says he heard the gunshot

23   and then he saw her fall.  But even before that, Your Honor,

24   he's different than other rioters who have been sentenced to

25   this charge.  He saw an officer attacked and sprayed with fire

1    retardant.  He saw the person who did it being taken into

2    custody.  He said he saw a gun clip on the ground and saw an

3    officer pick it up.  His videos show that there's smoke in the

4    air indicating -- as you know, on the west front lawn there was

5    a lot of smoke going up, the distress smoke of red that the

6    officers use, as well as the white smoke that was going up.

7    There was fighting down below on the west front terrace.  He

8    saw all these things and was pretty much on the forefront of

9    most of them.

10          So in Kevin Blakely's case he, too, was joining with

11   rioters pushing against police.  He remained on the Capitol

12   grounds and in order for him to leave, he had to be pepper-

13   sprayed.  And as I indicated in my memo, Mr. Packer, seeing all

14   this before he even saw the woman get shot, he stayed in the

15   building.  He did not leave until the officers were coming up

16   by the Speaker lobby doors and herding everybody out after the

17   shooting.  So he was inside, I think I said about 30 minutes.

18   He was inside and he was in a lot of different areas, and I

19   think all of that differentiates him from other individuals.

20          Another individual that was sentenced is Pamela

21   Hemphill, in 21-CR-555, that was Judge Lamberth.  Now, this was

22   a 69-year-old woman, also who pled to the same charge.  She

23   received 60 days incarceration with a 36-month term of

24   probation.  She deliberately pushed through police lines that

25   were protecting the east front of the Capitol, and she did that

1    on three occasions.  Mr. Packer was in the forefront on more

2    than three occasions.

3        She entered and remained in the Capitol building despite

4    all the signs of violent entry, just like Mr. Packer.  She saw

5    broken glass, broken windows, heard the audio alarm.  And as

6    you know, Your Honor, the Senate wing doors were alarmed.  And

7    about the time Mr. Packer was on the upper west terrace the

8    audio dispersal message was going on.  And in some of the

9    videos I've seen you can hear that when the folks are going

10   inside the building, when the mob is just pouring in there.  So

11   all of that was surrounding Mr. Packer.  She also was inside

12   and outside for about 30 minutes.  So that's very similar to

13   Mr. Packer.

14       Another defendant is Janet Buhler, B-U-H-L-E-R,

15   21-CR-510.  This was Judge Kollar Kotelly's case.  Now, like

16   Mr. Packer, this woman entered a sensitive area of the Capitol

17   building.  He went into an office, Ms. Buhler went into the

18   Senate gallery.  She cheered as rioters were attacking officers

19   at the east rotunda doors.  She, too, entered through the

20   Senate wing door and ignored several red flags, like did

21   Mr. Packer.  She, too, saw rioters scaling the scaffolding over

22   the northwest stairs, which is what Mr. Packer filmed in one of

23   our exhibits.  She saw the plumes of smoke rising in the air.

24   She received a sentence of 30 days incarceration, also with 36

25   months of probation.

1        My argument to you, Your Honor, I believe the sentence

2    of 75 days is more appropriate in this case because Mr. Packer

3    saw several violence -- violent things going on.  He also saw

4    several breaches.  And as I said, he was there when the rioter

5    was shot, and he saw an officer attacked and sprayed with the

6    fire retardant.

7        Another case, Your Honor, is Judge Sullivan, Stacie

8    Getsinger, G-E-T-S-I-N-G-E-R, 21-CR-607.  Judge Sullivan

9    imposed 60 days of jail, with 36 months of probation.  And like

10   Mr. Packer, this individual observed rioting outside, breaking

11   of windows and other violence going on before he entered.  He

12   was inside approximately 39 minutes and, like Mr. Packer, he

13   went into an office space as well.  And as I submit to you,

14   after reading the letter from his sister and reading the

15   defense memo and sitting in on the interview with Mr. Packer,

16   he has not expressed any remorse, other than remorse for

17   getting caught and for what's happened to him; not for what's

18   happened to the officers, the families of those who died, the

19   families of those who were injured and those who were injured.

20   It's all about what happens to him.  So, like Mr. Packer,

21   Mr. Getsinger showed no remorse.

22        And Mr. Packer was everywhere that violence happened,

23   exempt for the rotunda and the east doors, Your Honor.  He was

24   everywhere else.  He broadcast his intention for joining the

25   riot.  He wanted to support the subversion of our republic and

1    keep a dictatorial ruler in place by force and violence.  And

2    his words on his clothing showed you his intent.

3          Now, there are a couple cases that I think I mentioned

4    and/or Mr. Brennwald mentioned.  Bradley Rukstales,

5    Mr. Brennwald mentioned him.  We had asked for 45 days, you

6    gave 30 days.  Your Honor, the difference there, of course, is

7    that man had no criminal history.  Mr. Packer has 17 pages of

8    criminal history.  I agree that most of them are DUIs and

9    habitual violators and driving without a license because he was

10   suspended, but he also had a possession of marijuana, there was

11   some DB battery arrests, and there was also forgery of

12   documents, as well.

13         Because some of it is so old, the presentence report

14   states that his criminal history is a 2.  But I think -- I do

15   not think the 17 pages overrepresent.  Even though he's a

16   criminal history 2, he has lived a life where the criminal

17   justice system was a regular part of what he did and he's

18   familiar with the criminal justice system.  He was driving

19   while he was suspended and was on house arrest, if you look at

20   some of the entries in the presentence report.  And he violated

21   probation, as far as I could tell from the presentence report,

22   at least four times.

23         Again, another defendant was the Crase and Williams

24   individuals that Mr. Brennwald mentioned.  Again, Mr. Crase had

25   no criminal history, Mr. Williams had a DB arrest, but no

1    convictions.  And that was 21-CR-82.

2          Another person was Abual-Ragheb, A-B-U-A-L-dash-

3    R-A-G-H-E-B, 21-CR-43.  This woman had no criminal history.  We

4    asked for 30 days.  However, as you know, you considered a lot

5    of her personal situation -- her kids had been bullied in

6    school -- you did give her home detention.  And she did have a

7    lot of rhetoric pre-January 6th.

8          Your Honor, I truly believe that this individual,

9    Mr. Packer, is more culpable than some of the other folks who

10   pled guilty to the same charge because of all these actions

11   that were taken by him.  And Mr. Brennwald says he has -- in

12   his memo he talks about Mr. Packer having, like, a flat affect

13   in most of these stills and videos.  However, he was taking

14   video of what was going on.  He was an active participant in

15   what was going on.  And as you know, a mob is not created just

16   alone, it's one person at a time.  Just like an avalanche is

17   some stone at a time.  One stone is not going to hurt anyone.

18   You gather them altogether and they gave momentum, they gave

19   force.  And that's what happened in this situation.

20         The office that Mr. Packer went in was in the Speaker's

21   lobby area, Your Honor.  And, of course, as you know, that is

22   not an open public space.  And that is where he went and it was

23   literally two doors down from the conference room where all the

24   staffers were terrorized by what was going on and ran and

25   barricaded the door, fearing for their lives.  He was in the

1    hallway when that was going on, along with all the other

2    rioters.  And in one of the videos that I showed you, Your

3    Honor, there's a defendant -- I'm sorry, there's an individual

4    rioter who is trying to kick in a door as they make their way

5    to the Speaker's lobby area.

6         Mr. Packer's criminal history is extensive.  He has

7    admitted he, in his plea and in his sentencing memo, that he

8    knew that he was breaking the law.  But as his criminal history

9    has shown, Your Honor, he doesn't really care.  He went to the

10   Capitol to participate in the mob objecting to the

11   certification of the election and he contributed to the

12   obstruction and disruption of Congress that day.

13        To paraphrase John Donne:  No man is an island entire of

14   itself; every man is a piece of the continent, a part of the

15   main; if a clod be washed away by the sea, America is the less.

16   Without this man's actions and those of thousands like him, the

17   Electoral College vote would have proceeded in an orderly

18   fashion and we would have had a peaceful transition of power.

19   Instead, America watched in horror while mob rule dominated our

20   screens, until 3 a.m. on January 7th.

21        This is why the government believes that 75 days in

22   jail, followed by three years of probation, along with

23   restitution and the special assessment is the appropriate

24   sentence in this case.

25             THE COURT:  Thank you, Ms. Furst.

1    Mr. Brennwald, obviously, you are arguing on behalf of

2    Mr. Packer that he should get probation only, or probation,

3    preferably home detention.  So, obviously, I want to hear from

4    you on that point.  If you could, as you're advocating, address

5    whether you believe -- not that it's appropriate, I understand

6    your position about whether you think it's appropriate --

7    whether you think I have the authority to impose a split

8    sentence, that is to say, a sentence of incarceration followed

9    by probation.

10    MR. BRENNWALD:  Thank you, Your Honor.  To start with

11    your last question, I regret to tell you that I haven't done

12    enough research on it.  I've certainly followed threads from

13    other lawyers who have discussed it and who have discussed some

14    judges finding it appropriate and some judges finding it not

15    lawfully permissible.  I can just make the argument, because

16    I'm representing Mr. Packer, that it's not something that is

17    appropriate under the law.  But to be honest with you, as I

18    have to be, I just don't know.  I've read some memos on it but

19    I'm certainly not prepared, unfortunately, to discuss that.

20    And I apologize for that, I probably should have.

21    THE COURT:  Fair enough.  But, obviously, you make

22    the argument for sentencing that probation is appropriate here.

23    MR. BRENNWALD:  Yes.

24    THE COURT:  And I've read your papers, I am pretty

25    familiar with some of that, although not -- certainly all the

1    sentences I've imposed I'm familiar with.  I'm familiar with

2    some of the other sentences that Ms. Furst discussed.  But, you

3    know, without limiting you in any way, why do you think that

4    probation is appropriate?

5            MR. BRENNWALD:  Your Honor, I've asked myself the

6    question, if Mr. Packer had short hair, no beard, and was

7    wearing a Nike shirt, would he be viewed the same way?  And

8    Ms. Furst, multiple times this afternoon, argued that his shirt

9    showed his intent.  And there's no question that the shirt is

10    offensive, I alluded to this in my memorandum, Your Honor.

11        But I've been contacted by a number of Jewish

12    organizations, understandably, during the pendency of this

13    matter, and I'm just going to say this, because I think I need

14    to at this point:  There was an offer to have a meeting between

15    some folks from a certain community -- I don't mean the Jewish

16    community, but within that community -- and Mr. Packer.  And I

17    responded to those folks and told them we would be happy to

18    talk with them in a room somewhere.  But their desire was to do

19    it in a public forum, where I suspected that Mr. Packer would

20    be ridiculed, embarrassed, and humiliated, et cetera.  And so

21    ultimately, as I put in my memo, the only allusion to that I

22    made in my memo was that it was going to turn into a

23    circus-like atmosphere, which I just don't think is appropriate

24    here.

25        But, I don't want to personalize it by calling the

1    prosecutor's name.  The government argues repeated two things:

2    He was in multiple rooms and he was there for a period of time.

3    He was, and he was towards the front of the crowd.  But, I

4    vociferously pushed back, to be redundant, on any claim that he

5    was pushing anybody.  You never see, in any of these videos,

6    where he was pushing anybody.  He walked in, he walked around,

7    he looked.

8         As to the room that was off of the Senate -- or, off of

9    some hallway, he walked in there, saw somebody apparently

10   stealing something or doing something and he walked right back

11   out.

12        I have been on two Capitol tours that the government has

13   graciously allowed defense lawyers to go on because we have the

14   right to see the premises where the alleged crimes occurred.

15   And I have, as I mentioned in my memo, been on another tour

16   through the Architect of the Capitol, where a nonprofit on

17   whose board I served was given a private tour for hours all

18   over the place.  I have no idea, if I go in that building,

19   where I am.  These folks had no idea where they were going.

20        I'm not saying some people didn't have advanced notice.

21   There's some reports in the press about certain members of

22   Congress giving tours.  I don't know if that's true or not.

23   All I know is Mr. Packer had no idea where he was going.  He

24   was following people around.  He left at the end because he saw

25   or heard Ms. Babbitt being shot.  I think anybody, at that

1    point, would be so shocked that they would think, okay, we have

2    to go.  But I've looked at all these videos.  I have never seen

3    a single area or spot on this, on these videos where Mr. Packer

4    pushed anybody or pushed any officers.  So he's being -- I

5    think the sentence that's being requested stems mostly from his

6    appearance.

7             THE COURT:  Here's the thing, the thing is that I do

8    think that if he had put his hands on an officer --

9             MR. BRENNWALD:  Right.

10            THE COURT:  -- we wouldn't be talking about a

11   parading offense.  What we're talking -- within the category of

12   people who have pled guilty, he pleaded guilty to a parading

13   offense.  One thing I care a lot about is making sure that

14   there is not unwarranted sentencing disparities.  And --

15            MR. BRENNWALD:  Of course.

16            THE COURT:  -- and the fact that he didn't shove an

17   officer, at least directly, is the reason that we're talking

18   about the events we have here --

19            MR. BRENNWALD:  Sure.

20            THE COURT:  -- everyone in the category that I've

21   thought about in the -- who's pled guilty to this particular

22   offense, that would be true.

23            MR. BRENNWALD:  Yes, Your Honor.  I don't know if the

24   FBI agent is muted or not.  I see his information on screen and

25   I hear noise.  But, anyway.

1    Well, to respond, Your Honor, I've had these cases that

2    were just discussed sprung on me just now.  As the government

3    was speaking -- and as the government was speaking I was

4    scrambling to look up the sentencing memoranda that were filed

5    in their respective cases and to respond directly to what you

6    just mentioned.

7    Your Honor, in the Kevin Blakely case, which is

8    21-CR-356, that referenced his -- Mr. Blakely grabbing the

9    officer's baton.  So not everybody who had some kind of

10   touching or interaction with an officer was charged with an

11   assault.  Or maybe they were and the plea offer was to this

12   so-called (g) charge.  So I think that's a big difference.

13   Mr. Blakely apparently received 120 days.  But he was grabbing

14   the officer's baton -- scrambling to look up these memos while

15   the government was talking now -- that Mr. Blakely recorded ten

16   videos and encouraged others.

17   I want to see if I can pull up the memo in Mr. Blakely's

18   case.  He recorded videos -- and I'm quoting word for word,

19   although there are some bad words in here.  "Blakely recorded

20   videos in which he stated" -- and this is document 32, filed on

21   4-22-22, page 2.  "Blakely recorded videos in which he stated,

22   'America has taken their shit back.  We coming back and take

23   Congress another date and all these mother fuckers.'  He

24   encourage others who did not show up on January 6 to do so in

25   the future.  Both surveillance videos and officer body-worn

1    camera footage show Blakely resisting police officers and being

2    part of a group of rioters that engaged in physical contact

3    with officers."

4         Mr. Blakely is seen at the front of the crowd in the

5    physical -- I'm sorry, physical altercation, apparently

6    encouraging the crowd.  So, there are just differences between

7    what happened there and Mr. Packer.

8              THE COURT:  Mr. Brennwald, one thing that seems to

9    me, maybe I missed it, but the papers don't explain, from what

10   I saw, why Mr. Packer was wearing the sweatshirt in question.

11   Had there been a point?

12             MR. BRENNWALD:  I did not explain that, Your Honor.

13   I viewed it as a free speech issue.  Very offensive, obviously,

14   but I saw it more as a free speech issue.  And I see it as, to

15   this day, as something that's basically causing him to be

16   facing more time at the government's request because of that.

17        Can I explain why he was wearing that shirt?  I've had

18   discussions with Mr. Packer about concentration camps.  The

19   Court may not know this -- surely wouldn't know this -- I was

20   born -- I was born -- I raised in Switzerland, my father was

21   born in Germany.  I have gone to a concentration camp as a

22   child.  And at some point I just couldn't resist asking

23   Mr. Packer what his thoughts were on that.  And he admitted to

24   me that there were concentration camps there.

25        So, I don't want to get into any further discussions

1    about it, but the shirt is seriously offensive.  I don't,

2    however, believe or I submit that it wouldn't be appropriate to

3    sentence him based upon that because he's allowed to wear that

4    in our country.  In Germany, interestingly enough, I -- my

5    understanding is that he would not be allowed to wear that; it

6    would be a crime, or a civil fine of some sort at the very

7    least.

8         But the shirt is very offensive.  And I don't know how

9    much else I can say about that, other than, you know, he also

10    has long hair and he looks like a -- like a, I don't know, a

11    disciple or a rock freak or something.  He is a child of the

12    '70s rock era.

13         I have visited his home a number of times to discuss

14    things with him because he can't drive up here.  And I think

15    it's a credit to him that he's no longer driving.  But his home

16    and clean and neat.  I didn't see any memorabilia in there that

17    has Confederate flags, Nazi symbols.  I didn't smell any

18    alcohol, I didn't see anything like that.  I didn't smell any

19    marijuana.  He keeps a very tidy home, from what I saw.

20         So, it is what it is with him.  He and I discussed

21    briefly the different rock groups we like, things like that.

22    But, you know, he's from that era.  And it's just awful that he

23    wore that shirt that day.  I just don't think it's appropriate

24    to give him extra time because of that, because he is allowed

25    to wear it.

1    You know, the government can say that indicates his

2    intent that day.  Well, you know, the people who were there

3    that day certainly came from a whole variety of different

4    groups, belief systems, whether they're Oath Keepers, Proud

5    Boys, Three Percenters, neo-Nazis, white supremacists.  He's

6    expressed to me that he's offended by being called a white

7    supremacist.  He's also been on CNN an awful lot, he was at the

8    very beginning, and he was very mad when people were calling

9    him a white supremacist because he doesn't see himself that way

10   at all.

11   But as far as the shirt is concerned, I think that's

12   really all I can say about that, unless you have any other

13   question about that.

14   But, I'm looking at the Buhler sentencing memo -- that's

15   the 21-510 that the government mentioned -- it states in a memo

16   that Mr. Buhler (sic) was actually in the Senate gallery.

17   That's a huge difference between being in a hallway or

18   somewhere near it.  Once you get in there and you see where you

19   are and you go in there, that's -- that's a step beyond.

20   Mr. Buhler cheered -- unlike Mr. Packer, he cheered as

21   rioters physically crushed U.S. Capitol police officers at

22   these rotunda doors.  Mr. Buhler deleted photographs -- I'm

23   sorry, it's a Miss, apparently.  Miss Buhler deleted

24   photographs on her phone that were documenting her time in the

25   Capitol.

1          So I think that -- again, all these cases, I didn't know

2     about these cases, frankly, until the government mentioned them

3     20 minutes ago.  As I'm scrambling to see, they're all

4     distinguishable.  Every case I cited, every case where this

5     Court imposed a sentence of imprisonment in a case under the

6     statute, I thought I did my best to distinguish those cases

7     from Mr. Packer.

8          And the Stacie Getsinger case, 21-607, the government's

9     memorandum indicates that she observed fighting between the

10    police and rioters, she appeared to smoke marijuana in the

11    Capitol.  She expressed no remorse for her actions, but only --

12    not only that, but she bragged that she and her husband were

13    the first 100 to get inside, and then she actively spread false

14    information on social media, downplaying the violence and

15    claiming that the rioters were actually peaceful, not violent.

16         Again, so if I'd had a chance to look at all these and

17    review these ahead of time, I could have perhaps responded more

18    cogently.  But on the Rasha Abual-Ragheb case, 21-43, which is

19    one of Your Honor's cases, the government's memorandum states

20    that -- if I could -- there's a whole bunch of postings here.

21    She posted before the election -- I guess after the election,

22    "I made it to every rally.  No one in New Jersey counts votes.

23    Stand up.  I won't stop, they'll have to kill me."  She just

24    made a whole bunch of comments like that.  She then said, on

25    December 20th, referring to this rally here -- quote/unquote

1   rally -- "Yeah, bring your own guns."

2          So I mean, everybody in here who's getting -- she also

3   said, "I'm bringing pepper spray, knife, and small toy for

4   protection."

5          Anyway, everybody in here who's got time is just

6   distinguishable from Mr. Packer.  I strongly disagree with the

7   government that he pushed anybody or that he touched any

8   officers.  Should he have been there?  No.  Should he have gone

9   up inside the building after seeing violence on the west side?

10  Absolutely not.  But he did and he pled to that, that's what he

11  is facing sentencing for.

12         But, I'm trying to think of anybody else who could be

13  less culpable than him and still guilty of something.

14  Because -- and the government talks about his mouth being open

15  at points.  Well, people walk around, sometimes their mouth

16  open, sometimes with their mouth closed.  You can never hear

17  him actually say anything.  The government submitted a memo --

18  I don't know if the Court saw it -- this morning at some point.

19  And I listened to that and, again, I couldn't tell anything

20  there that showed Mr. Packer talking or anything else.

21         So, he literally walked in, he went to too many places.

22  The government calls him out for going to six different places,

23  calls him out for being in there 36 minutes.  That's fine,

24  that's all rational.  That's what he did.  But he didn't do

25  anything else.  That's why I mentioned that he just kind of

1    walks around like he was looking.  He doesn't scream, he's not

2    holding a sign, he's not yelling, he's not encouraging people.

3    I mean, I have other cases and I've seen other cases where

4    people are, like, "We need more men down here.  Don't stop.

5    Keep pushing."  None of that.  He literally is not a bystander

6    because he's there, but he's as close to a bystander as you can

7    get in a case like this.

8         He didn't delete anything from the phone, he didn't do

9    any of that type of thing.  He just went there in an offensive

10    shirt, with long hair and a beard, and after 30 minutes of

11    going different places and then hearing a shot, he left.  He

12    shouldn't have stayed there as long as he did, he shouldn't

13    have done what he did.  The question is:  Does he need to go to

14    jail for that, given his behavior in comparison to the behavior

15    of hundreds and hundreds of other people?

16         The only thing that distinguishes him from some of the

17    folks that the Court has -- where the Court has sentenced other

18    defendants, or where other judges have sentenced other

19    defendants to probation is his record.  But, again, as I keep

20    trying to point out, that record is borne of a disease of

21    alcoholism.  It turns into a crime once you drive, and he

22    definitely did that.  But that's what it steams from.  It

23    doesn't stem from an evil mind, it doesn't stem from a

24    malicious thought process.  That's a person who was, sadly,

25    drinking and probably spent a lot of times at night drinking on

1    the couch by himself.

2        So I really think that that criminal history should not

3    weigh as strong as it might in the case of somebody who's

4    stealing all the time, assaulting people, things like that.  I

5    mean, this is a very different type of situation.

6        So I want to finish, Your Honor, by saying that I've

7    spoken to Mr. Packer about his right to speak before you.  I've

8    spoken to him about this for probably six months or eight

9    months; since he pled guilty.  He's indicated that he would

10    like me to speak for him.  He's not comfortable speaking.  I

11    think -- and I'm just deducing this from my interactions with

12    him -- that he's afraid that whatever he says is going to be

13    splashed out there anywhere on social media or places like

14    that.

15        I made an unfortunate reference in my memorandum to a

16    character who I thought was sort of similar, kind of bumbling

17    through life, and I've already gotten multiple emails from

18    literally around the world, telling me I was insulting Forrest

19    Gump.  And I say this because Mr. Packer is really concerned

20    that whatever he says is just going to be splashed out there

21    and he'll be further embarrassed.  He's already very humiliated

22    by all this.  He wanted me to sue Nancy Pelosi when she made

23    some comment on the House floor about him being a white

24    supremacist.  So with all due respect, Your Honor, he would

25    rather have me speak for him and not give others more fodder.

1          But I can tell you, I've talked to him and he told me,

2     as we sat on the couch in his living room, that he does regret

3     being there.  It's not fair to say he doesn't regret it.  It

4     was a bad situation.  He doesn't regret it because he's

5     arrested, he regrets it because it was just an unfortunate

6     thing that should not have happened.

7          THE COURT:  Thank you, Mr. Brennwald.

8          Ms. Willett, obviously I've read your PSR, of course,

9     and the recommendation.  It seems to me that, just on a limited

10    question, at least, that it was unclear whether you had been

11    able to get access to Mr. Packer's financial records for

12    purposes of looking through as to whether and to what extent he

13    can afford a fine.  Is that still the case?

14         THE PROBATION OFFICER:  Your Honor, actually

15    Ms. Baker did this presentence report.  I'm covering the

16    hearing for her.  But, she did leave me some information to say

17    that Mr. Packer did submit some of his financial forms back in

18    June and had -- he had not, at the time, consented to the

19    release of his credit report, and I'm not actually sure if that

20    ever occurred.

21         As far as his financial situation --

22         MR. BRENNWALD:  Your Honor, maybe I can help Ms.

23    Willett.  I understand the income he has to this day is $4,300

24    a month.  That's what he said he made when he worked for the

25    company, before he was fired by them after this happened.  And

1    apparently that continues to be the case in his freelance

2    efforts.

3            THE COURT:  I remember seeing that income, yes.

4            THE PROBATION OFFICER:  And, Your Honor, based on

5    what she saw on his financials as they were reported to her,

6    she indicated to me she was recommending a $1,000 fine, Your

7    Honor.  That's all the information I have.

8            THE COURT:  Ms. Furst, what is the government's view

9    about the appropriateness of a fine in this case?

10           MS. FURST:  Your Honor, we haven't been asking for

11   fines, as you know, unless there is a situation where the

12   defendant had profited from his being present.  Some people

13   have given interviews and been paid for them or they sold

14   memorabilia.  So that's the position, Your Honor, that's why I

15   didn't ask for a fine.

16           THE COURT:  Thank you, Ms. Furst.  I think I have it

17   all.  So as I said at the beginning, what I would like to do

18   now is take a brief recess, maybe five minutes, maybe ten.

19   What I typically do is I will have Ms. Leslie let everyone know

20   when I'm about to rejoin the video conference.  I would just

21   remind people that everything you say, if you're not muted, can

22   be heard by everyone else, both those on this video and anyone

23   who has dialed in.  So while we're in recess, just be mindful,

24   this is still a live video.

25           With that, we'll take a brief recess.  And with that,

1    I'll let Ms. Leslie know and she can let everyone know when I'm

2    about to return.

3         (Recess.)

4         THE COURTROOM DEPUTY:  Your Honor, we're now back on

5    the record.

6         THE COURT:  Thank you, Ms. Leslie.  So before I make,

7    potentially, my findings, the § 3553(a) factors, I'll just

8    recap the various sentencing recommendations that I have.

9         The government that recommends I sentence Mr. Packer to

10   75 days incarceration, followed by 36 months of probation, 60

11   hours of community service, and $500 in restitution.  Probation

12   recommends that I sentence Mr. Packer to 21 days of

13   incarceration and $500 in restitution, together, as we said

14   earlier -- as we discussed earlier with Ms. Willett, a $1,000

15   fine.  Mr. Packer, for his part, requests some amount of

16   probation only, or otherwise home detention, and, again, $500

17   in restitution, based on a plea agreement.

18        The parties, obviously, have a fairly significant

19   different perspective as to what sentence is appropriate here,

20   so I'm going to walk through my view of the § 3553(a) factors

21   in imposing a sentence.

22        The first factor, of course, is the nature and

23   seriousness of the offense.  I've said this many times before,

24   the events of January 6th were unquestionably serious.

25   Mr. Packer and others entered the United States Capitol while a

1    joint session of Congress was meeting to certify the results of

2    the presidential election.  Many of the rioters came to the

3    Capitol for the express purpose of interrupting those

4    proceedings.  Many used violence against law enforcement

5    officers or engaged in vandalism.  Mr. Packer certainly

6    observed those events.  Many of those rioters engaged in

7    planning efforts before January 6th, suggesting that they

8    intended to engage in violence.

9        Mr. Packer's conduct on January 6 was certainly less

10   severe than many others, but it was still not innocuous.  He

11   entered the Capitol despite seeing broken windows and teargas

12   being deployed by the police.  He's conceded he knew that he

13   would not have permission to enter the building, traversed

14   various areas of the Capitol building, through the Crypt,

15   Statuary Hall leading to the House side.  He was in a crowd of

16   people when the rioters took down and broke apart the sign on

17   which the Speaker's name was written.

18       He was present when the large mob decided to go into the

19   House side of the Capitol, although he did not carry a banner,

20   flag or sign.  He wore a distinctive and incredibly offensive

21   sweatshirt.  The words "Camp Auschwitz" and "Work Means

22   Freedom" on the front and the word "Staff" on the back.

23       He did not leave the Capitol building until after he

24   witnessed the shooting of a rioter, which was about 30 minutes

25   after he entered the building.  There is, however, no evidence

1    that Mr. Packer himself engaged in any acts that could fairly

2    be characterized as directly aggressive toward the police or

3    involving himself engaging in property destruction.  But as

4    I've discussed before, the contribution of Mr. Packer and

5    others who behaved similarly to him cannot be overlooked.  The

6    volume of people at the Capitol was the reason the police were

7    overwhelmed at certain parts, certain points of the riot and

8    the reason that confrontations with Capitol police grew

9    dangerous and even fatal.

10        The second characteristic I must consider, the history

11   and characteristics of the defendant.  Mr. Packer's 67 years

12   old, a lifelong residence of Virginia, with some stints in

13   other locations.  He's self-employed as a plumber and labor.

14   His wife appears to live in Russia and he has a son from a

15   previous relationship.  He doesn't have a relation with his

16   son.  And although the PSR states that Mr. Packer says he

17   doesn't know the reason, I think his brief sentencing

18   memorandum states that his son will not speak with him because

19   of his political views.

20        The letter from Packer's sister, which I referenced

21   earlier today, from Miss Kimberly Rice, attests to his

22   character and said that Mr. Packer has helped her raise her son

23   and is remorseful about his actions.

24        As was discussed earlier today Mr. Packer has an

25   extensive criminal history stretching throughout his adult

1    life.  Many of his offenses are traffic-related offenses,

2    including reckless driving, driving under the influence, and

3    driving with a revoked license.  His past offenses do, though,

4    include larceny, marijuana possession, and a 2004 conviction

5    for forging public records.  Mr. Packer was convicted and

6    sometimes incarcerated for many of his past offenses.

7        That criminal history is quite long.  As Ms. Furst

8    indicated, it spans some 15 or -- really, more than 15 pages of

9    the PSR, which is quite substantial.  The probation --

10   although, of course, everyone knows that the guidelines don't

11   apply here, probation estimates that his criminal history is

12   Category II, which does distinguish Mr. Packer from at least

13   some other defendants that have pled guilty to misdemeanor

14   offenses.  On the whole, Mr. Packer's criminal history weighs

15   in favor of a more substantial sentence, but not heavily, in my

16   view.

17       The next factor I must consider is protecting the public

18   with respect to the law and deterrence.  I must ensure the

19   sentence I impose promotes respect for the law, must ensure the

20   sentence here is properly calibrated to deter both Mr. Packer

21   and others from engaging in this kind of conduct.  I conclude

22   that Mr. Parker poses a somewhat low rate of recidivism for

23   this particular type of crime or similar ones.  There's little

24   evidence before me that Mr. Packer has engaged in conduct like

25   this before.

1          The parties disagree about whether Mr. Packer has shown

2     significant or, really, any remorse for his actions.   The

3     government argues that Mr. Packer was evasive and he minimized

4     his actions when interviewed by the FBI.

5          On the other hand, there aren't any statements in the

6     record, at least as far as I know, that boasts about the event

7     or his conduct on that day.  Mr. Packer has said in his

8     sentencing memorandum that he greatly regrets going to the

9     Capitol and would not go into the building again if he had a

10    chance to do it all over.  He stated that he does not condone

11    in any way the violence that took place in and out of the

12    building on that day, end quote.  I find the statement of

13    remorse to be basically sincere.  But it's certainly not as

14    strong or sincere as I have seen from a number of other

15    defendants who have both written letters, spoken on the record,

16    and otherwise apologized vociferously for their behavior on

17    January 6.

18          Finally, with respect to this topic -- or, one more

19    point.  Since being arrested, Mr. Packer has fallen short at

20    times in his compliance with pretrial services; failing to call

21    in five times in the span of about 20 months, and has received

22    verbal warns for his failure to report.  These are not major

23    failings, but they are, nonetheless, failings.  In addition,

24    others must be sufficiently deterred from engaging in similar

25    action.  Being around and within a violent riot -- I think it

1    goes without saying, but I think it needs to be said -- in a

2    way that even if you are not yourself violent, prevents police

3    from dealing with those who are.

4         January 6 wasn't an ordinarily violent riot, it was one

5    that interfered with the counting of Electoral votes and

6    peaceful transition of power.  Such transitions of power are

7    what allow us to have a democracy at all.  United States

8    citizens can question election integrity, they may petition or

9    protest Congress, but they must do so lawfully; not as a part

10   of a riot and not in the Capitol on a day and time that was as

11   sensitive as January 6, 2021.  An exceedingly light sentence

12   here may not sufficiently deter other would-be future rioters.

13        I spent a lot of time earlier talking about the next

14   factor, and the parties note it's something I've spent a lot of

15   time on in prior hearings, and that is avoiding unwarned

16   sentencing disparities.  As I've said before, there are few

17   relevant comparators outside the January 6 cases.  Sentences

18   for protests or riots in other places and at other times

19   sometimes understate the severity of the events that took place

20   at the Capitol.  But we now have many other January 6 sentences

21   that involve the same offense Mr. Packer has pleaded guilty to

22   here.

23        Such sentences have ranged from as high as the statutory

24   maximum of six months, which I imposed in a different case,

25   incarceration, to as low as a $500 fine with no probation or

1    incarceration.  But in some respects, those are outliers.  In

2    general, the more severe, more relatively severe cases have

3    generally received 45 or 60 and all the way up to 120 days

4    incarceration.  And less of your cases tend to have had one,

5    two, or three years of probation, either with or without one or

6    two months of home confinement.

7          Based on my review of the evidence in this case, as well

8    as what other judges in this court have given as sentences

9    imposed in their cases, together with the reasons I have

10   thought appropriate to impose a sentence in the cases where I

11   have imposed sentences for defendants who have pleaded guilty

12   to the very same offense as Mr. Packer, it appears to me that

13   Mr. Packer is somewhat above average in severity and

14   culpability compared to others who have been sentenced to a

15   parading charge.

16         Mr. Packer was not leading the pack, but he was also at

17   the forefront, as Ms. Furst indicated earlier.  He consistently

18   traveled with the pack to various parts of the building,

19   including areas close to the House side that the mob was trying

20   to breach.  He was in the vicinity of significant violence.  He

21   did not leave until after a substantial period of time, until

22   after one of the rioters was shot by Capitol police.  A number

23   of defendants that I have sentenced one could not say that

24   about; they either entered the Capitol where, essentially, less

25   violence was occurring, where they would not likely have been

40

1    aware of the violence.  Frankly, they were in a different part

2    of the building.  And even when in the building they would not

3    have been as close to and as aware of violence as Mr. Packer

4    was.

5            But as I said, there's been no evidence that he did

6    anything that can be fairly characterized as actually

7    physically assaulting or directly aggressive toward the police

8    or actually engaged or intending to engage in property

9    destruction.  In addition, on the whole, Mr. Packer has been

10   generally cooperative with pretrial services, with some

11   slipups, and has expressed some remorse for his actions.  But,

12   of particular note, and I think this is important, Mr. Packer

13   has as substantial, if not more substantial, criminal history

14   as any defendant I have had sentenced on this parading charge.

15   And that is a more concerning criminal background as a result,

16   certainly than average.

17           And while I appreciate Mr. Brennwald's characterization

18   of Mr. Packer's wearing of this sweatshirt that we've discussed

19   today, it seems to me that he wore that sweatshirt for a

20   reason.  We don't know what the reason was, because Mr. Packer

21   hasn't told us.  And we're left to infer that there had to have

22   been some, I would think, inappropriate reason for his having

23   worn such a truly offensive sweatshirt.

24           So for those reasons, I tend to think that Mr. Packer

25   is -- both his conduct on the day of January 6, somewhat more

1    culpable than others who I have had before me, he has a more

2    significant criminal history, and then, of course, there's the

3    question of what can we draw from his wearing of the

4    sweatshirt.

5        I also have to consider the need to provide restitution

6    to any victims of the offense.  As I've said before, I've

7    always been a little unclear about the statutory basis for a

8    restitution order.  It's not obvious to me there is such a

9    basis, but there's at least a colorable argument Mr. Packer was

10   part of a group that collectively caused harm at the Capitol

11   and Capitol officers.  Mr. Packer has agreed to pay restitution

12   in the amount of $500.  Because of the plea agreement and the

13   colorable argument, I consider it appropriate to order

14   Mr. Packer to pay restitution in the agreed amount.

15       One more point.  As Ms. Furst indicated earlier, I am of

16   the view that I do not have the authority -- unless the

17   defendant expressly consents -- to impose a so-called split

18   sentence.  That is to say, I do not believe I have authority in

19   this case to impose a sentence of incarceration to be followed

20   by probation.  Of course, here the government's recommendation

21   is 75 days of incarceration to be followed by a substantial

22   probationary period.  I don't believe I can do both of those

23   things.

24       For all of these reasons, taking account of the entire

25   record of this case, all the argument that was presented to me

1    earlier today, pursuant to the Sentencing Reform Act of 1984,

2    in consideration of the provisions of 18 U.S. Code § 3553, it

3    is the judgment of the Court that you, Robert Packer, are

4    hereby sentenced to a term of 75 days incarceration, and

5    restitution of $500 on Count 2.

6         In addition, you're ordered to pay a special assessment

7    of $10 in accordance with 18 U.S. Code § 3013.  I authorize

8    jurisdiction of this case to be transferred to the

9    United States District Court for the District of Virginia post

10   incarceration.  You're order to make restitution to the

11   Department of the Treasury as provided in the plea agreement in

12   the amount of a $500.  I do not waive interest or penalties.

13   You must pay the balance of any restitution within 30 days of

14   the entry of judgment.  As I said, you must pay a special

15   assessment of $10 in accordance with § 18 U.S. Code 3013.

16        At the plea hearing we discussed your rights to appeal

17   and those that you are waiving.  If you do choose to appeal,

18   Mr. Packer, you must file an appeal within 14 days after entry

19   of judgment.

20        Mr. Brennwald, I assume that you would like Mr. Packer

21   to self surrender.

22             MR. BRENNWALD:  Yes, Your Honor.

23             THE COURT:  Ms. Furst, any objection from the

24   government?

25             MS. FURST:  No, Your Honor.

1            THE COURT:  Mr. Packer may self surrender.  And the

2    conditions of his pretrial -- or, his current conditions of

3    release shall continue.

4         Ms. Willett, in light of the D.C. Circuit decision last

5    week, are there any additional findings on the oral record that

6    you think I need to make with respect to the sentence here?

7            THE PROBATION OFFICER:  I don't think so, Your Honor,

8    because there was no conditions of probation that were imposed

9    in this case.

10           THE COURT:  I'm not imposing probation.  I cannot

11   impose supervised release as a result.  I'm imposing just the

12   term of incarceration and the restitution and the assessment.

13        With that, are there any questions from the government,

14   Ms. Furst?

15           MS. FURST:  No, Your Honor.  No, Your Honor.  Thank

16   you.

17           THE COURT:  Mr. Brennwald, anything from you?

18           MR. BRENNWALD:  No, Your Honor.  I was just looking

19   to see if I could locate a place where I could ask the Court to

20   recommend Mr. Packer serve his time.  But the only thing I see

21   that would be anywhere close to him is the FCC -- FCI at

22   Petersburg Low, but ultimately the Bureau of Prisons will make

23   a determination based upon his SENTRY score.

24           THE COURT:  If you would like -- obviously, we need

25   to enter the judgment.  If you would like to consult with

```
 1      Mr. Packer and communicate to Ms. Leslie if there's a

 2      particular place you would like me to recommend, and we can put

 3      that in the judgment.

 4              MR. BRENNWALD:  Thank you.

 5              THE COURT:  Thank you all.

 6              MS. FURST:  Oh, Your Honor?

 7              THE COURT:  Ms. Furst.

 8              MS. FURST:  I'm sorry.  I haven't moved to dismiss

 9      the remaining counts, and I so do.

10              THE COURT:  Government's motion to dismiss the

11      remaining counts is granted.

12              MS. FURST:  Thank you.

13              THE COURT:  Anything else?

14              MS. FURST:  No, Your Honor.

15              THE COURT:  Thank you all.

16                              *   *   *

17

18

19

20

21

22

23

24

25
```

1

2                     CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5     foregoing constitutes a true and accurate transcript of my

6     stenographic notes and is a full, true and complete transcript

7     of the proceedings to the best of my ability.

8                           Dated this 1st day of December, 2022

9

10

11                         _____

12                         Janice E. Dickman, CRR, CMR, CCR
                           Official Court Reporter
13                         Room 6523
                           333 Constitution Avenue, N.W.
14                         Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25